## COOPER ET AL. V. PEOPLE EX REL. WYATT.

|     |     |
| --- | --- |
| 13  | 337 |
| 15  | 440 |
| 13  | 337 |
| 17  | 256 |
| 13  | 337 |
| 18  | 581 |
| 2a  | 199 |
| 13  | 337 |
| 23  | 418 |
| 13  | 337 |
| f26 | 484 |
| 13  | 337 |
| e30 | 465 |
| 13  | 337 |
| 35  | 335 |
| 35  | 337 |
| 35  | 373 |
| 35  | 379 |
| 35  | 381 |
| 35  | 384 |
| 35  | 392 |
| j35 | 393 |
| 35  | 401 |
| 35  | 420 |
| f37 | 117 |
| 37  | 420 |
| 37  | 421 |

1. REVIEW OF JUDGMENTS FOR CONTEMPT — CONSTRUCTION OF STATUTE.— The statute providing that "the judgments and orders of the court or judge made in cases of contempt shall be final and conclusive" has reference only to the extent of the review in such cases, and not to the mode of review, whether by writ of error or otherwise.

2. EXTENT OF REVIEW ON WRIT OF ERROR.— Contempt proceedings may be brought to the supreme court upon writ of error from the final judgment, but the review upon such writ extends only to an inquiry into the jurisdiction of the court entering the judgment.

3. SAME — JURISDICTION.— When an affidavit is presented as a basis of a proceeding for contempt, the court must, in the first instance, examine the same, and, if the facts presented do not show that a contempt has been committed, the court will be without jurisdiction to proceed; but if the facts are sufficient, the court may take jurisdiction, and its subsequent orders will not be reviewed for mere errors.

4. INHERENT POWER OF DISTRICT COURTS TO PUNISH FOR CONTEMPT — NO RIGHT OF JURY TRIAL IN SUCH CASES.— The district courts of this state have the inherent power to summarily convict and punish, as for a contempt of court, those responsible for articles published in reference to a cause pending, when such articles are calculated to interfere with the due administration of justice in such cause. Neither the statutes nor the constitution present any barrier to the exercise of such powers. The right of trial by jury does not extend to cases of contempt. The power to punish summarily in such cases is essential to the very existence of a court. The contrary rule would place it in the power of a vicious person to so conduct himself as to prevent any kind of a trial.

5. LIBERTY OF SPEECH AND PRESS — ABUSE.— While liberty of speech and of the press is guarantied by our constitution, by a subsequent clause of the same sentence in which this is declared the responsibility for its abuse is fixed.

6. SAME — RIGHTS AND LIMITATIONS.— With us the judiciary is elective, and every citizen may fully and freely discuss the fitness or unfitness of all candidates for the positions to which they aspire, criticise freely all decisions rendered, and by legitimate argument establish their soundness or unsoundness, and comment on the fidelity or infidelity with which judicial officers discharge their duties; but the right to attempt, by wanton defamation, to prejudice the rights of litigants in a pending cause, degrade the tribunal, and impede, embarrass or corrupt that due administration of justice which is so essential to good government, cannot be sanctioned.

7. HABEAS CORPUS — WHEN JURISDICTION TO ISSUE WRIT PRESUMED. By statute the district courts of this state and the judges thereof are expressly given general jurisdiction to issue the writ of *habeas corpus*, and the jurisdiction to issue the writ in a particular case will be presumed in the absence of a showing to the contrary.

    PER MR. JUSTICE ELLIOTT — PRINCIPLES OF COMITY.— A district court or district judge has no authority by *habeas corpus* to release a prisoner under commitment by a criminal court for contempt against its authority in a matter wherein the criminal court has jurisdiction; and, in general, one court should not judge the jurisdiction of another tribunal of co-ordinate authority and dignity. The principles of comity should prevail.

### *Error to District Court of Arapahoe County.*

PLAINTIFFS in error, together with one N. P. Hill, were, by the court below, ordered to appear and show cause why they should not be punished as for contempt of court, on account of the publication in the Denver Republican, a daily newspaper published at and having a large circulation in the city of Denver, where the court was being held, certain articles, together with a large cartoon, all having reference to a cause pending in said court. The matter was heard upon the following affidavit and answer:

"STATE OF COLORADO, *County of Arapahoe — ss.* In the district court.

" *The People of the State of Colorado, on the relation of John J. Wyatt, vs. Nathaniel P. Hill, Kemp G. Cooper and William Stapleton.*

" John J. Wyatt, being duly sworn, on his oath deposes and says: That he is the petitioner in a certain proceed-

ing for a writ of *habeas corpus* now pending in this court; that under a certain warrant of commitment, issued out of the criminal court of Arapahoe county, this affiant was, on the 11th of July, A. D. 1889, arrested and taken to the county jail of said county; that as soon as practicable after said arrest this affiant had prepared, and himself duly verified, a petition for a writ of *habeas corpus*, and by his counsel applied to George W. Allen, one of the judges of the court, to hear and act upon the same; that said judge then and there stated to the counsel of this affiant that he was so much engaged in important trials then pending in his division of said court that he could not, with reasonable attention to said trials, give the time and attention to affiant's said application which its importance demanded, and suggested that affiant's counsel apply to one of the other judges of said court; that thereupon the counsel applied to Hon. O. B. Liddell, another of the judges of the said court, to hear said petition; that said last-named judge stated to said counsel that he was already worn by protracted hearings, and had a crowded docket of hearings requiring immediate attention, and requested the said counsel to apply to another of the judges of said court whose docket was not at that time so crowded; that thereupon said counsel of this affiant presented said petition to Hon. T. B. Stuart, a judge of said court, and requested that upon said verified petition his honor, Judge Stuart, would order the issuance of a writ of *habeas corpus*, and admit this affiant to bail until a hearing could be had as to the legality of his imprisonment; that an order to that effect was indorsed upon said petition by his honor, and a writ issued in accordance therewith, and a bond executed by this affiant in accordance with the terms of said order; that said cause was, on said 11th day of July, 1889, docketed in this court as cause No. 11,230, where it now remains, and is still undetermined; that this affiant appeared in person and by his counsel at court before his honor Judge

Stuart, at the opening of court on Friday, the 12th day of July inst., pursuant to the order aforesaid, there to abide any order which the court might make in the premises, and at the request of the district attorney then and there present the hearing of said cause and further action therein was postponed, and by agreement set down for hearing on Monday, the 15th day of July instant.

"And your affiant on oath states that on the morning of Saturday, July 13th inst., the Denver Republican, a newspaper published in the city of Denver, contained the following articles pertaining to said cause and the action of this court and judge thereof in said matters, to wit:

### "'Stuart was the Tool.

"'*The District Court Judge Released Johnny Wyatt on Bail — Stretching Power of a Court — A Fanciful Affidavit Finds a Willing Judge, Who Steps Outside of a Precedent and Legal Warrant and Nullifies the Power to Punish for Contempt of Court — The Proceedings Continued in Judge Stuart's Court until Monday, but Some New Moves May Be Made To-day.*

"'Johnny Wyatt swore to a gauzy fiction. Judge Stuart did a thing unprecedented in legal annals. He released the prisoner on bail on a *habeas corpus* proceeding, and nullified a court's power to punish contempt.

"It was not Judge Stone who granted the application for J. J. Wyatt's release from jail on bail. Wyatt led the Republican to believe Thursday night that it was Judge Stone. He was released from jail on the order of Judge Thomas B. Stuart, who allowed bail to be accepted. To secure his release Wyatt made oath that he was detained without due warrant or process of law, when he knew it was false. To bring about a hearing in a *habeas corpus* proceeding the court orders the body of the prisoner to be brought before him, and the writ is

returnable at once.   If the court is not prepared at that time to hear argument in the case he sets the time, and remands the prisoner.   That was the way Johnny got out of jail on Thursday night.   Through a continuance of Judge Stuart's unwarranted proceeding, Wyatt is at liberty still, and will be, if Stuart can have his way, until Monday.   Judge Stuart postponed a hearing in the matter yesterday until Monday, and he knows he will have nothing more to do in the case.   The same procedure could have been taken yesterday by the counsel of Wyatt, and the supreme court could have been appealed to just as quickly; but it needed the unwarranted interference of a district court judge who would step outside of a legal precedent to keep precious Johnny out of jail for two or three days.'   [Here follows the publication of an alleged interview with Judge Stone.]

### " 'How Johnny Got Out.

" 'Judge Stuart was sought at his residence at 9 o'clock Thursday night by Wyatt's attorneys, who had a petition already prepared for a writ of *habeas corpus.* The petition was made out in Wolcott & Vaile's law office several days ago, but Messrs. Riddell and Easley had to secure a copy of the warrant for commitment before they could present it to a judge.   It is a voluminous petition, and reviews the whole proceedings in substance. It is sworn to and signed by Wyatt.   Upon oath he claimed that he was "unlawfully and illegally deprived of his liberty."

" 'In the matter of application for the writ of *habeas corpus,* Wyatt made affidavit to the court (Judge Stuart) that he was unlawfully imprisoned, detained, confined and restrained of his liberty by Sheriff Weber; that he had been and was advised by counsel, H. Riddell and George W. Easley, that his imprisonment, detention and confinement was illegal.'   *   *   *

## " 'THEIR MODEST REQUEST.

" ' After setting forth the allegations, Wyatt's attorneys asked for a writ of *habeas corpus*, directed to the sheriff, commanding him to have the body of Wyatt before the court (Stuart), to do and receive what should then be considered proper by the court concerning him, together with the time and cause of his detention, and that he be restored to his liberty. Judge Stuart read the petition, and shortly after 10 o'clock Thursday night issued the following writ, which gave Wyatt his liberty on bail until the case could be heard:

" ' *To the Clerk and Sheriff:* Let a writ of *habeas corpus* issue upon the foregoing petition, returnable on Friday, July 12, 1889, at 10 o'clock A. M., at the court-house in Denver. In the meantime the prisoner may be admitted to bail upon giving bonds in the penal sum of $1,000, conditioned that the prisoner, John J. Wyatt, shall appear at the hour above mentioned and abide the order of the court, said bond to be approved by the sheriff.'

## " 'IN STUART'S COURT.

" ' When the above order was secured Thursday night Wyatt was released by the acting sheriff until 10 o'clock yesterday morning, when the writ was returnable. Wyatt and his legal advisers, Messrs. Riddell and Easley, appeared before Judge Stuart for a hearing of the *habeas corpus* proceedings. The case is growing to such gigantic dimensions that J. F. Vaile, the junior member of the law firm of Wolcott & Vaile, for which concern Mr. Easley is hired to do the dirty work, has also gone into the case. He was present at the time. The prosecution was not aware of the case coming up when it did, and was not prepared to argue it. Assistant District Attorney Abbott told Judge Stuart that he wanted to be heard in the matter and would have to postpone it. The

court replied that there would be no snap judgment in
the case. Then the hearing was postponed until 10
o'clock Monday morning. In the meantime Judge Stu-
art permitted Wyatt to be out on bail. The bond is in
the sum of $1,000, and George H. Graham and William
Vaile are on it as sureties.

" 'Among lawyers and authorities Judge Stuart is
receiving severe criticism for allowing Wyatt to be out
on bail, for a *habeas corpus* is a proceeding requiring the
sheriff to take his prisoner from jail before the court that
issues it, and then show cause to the jury why he (the
sheriff) deprives such prisoner of his liberty. This was
not the rule in the Wyatt case, for he was not taken
from jail, as he had already been liberated by a bond.'

" 'WITHOUT AUTHORITY ' — 'BACK TO JAIL, JOHNNY.'

[Under the above head-lines alleged interviews with
various persons are published, all denunciatory of the
action of Judge Stuart in the premises.]

" 'A JUDICIAL OUTRAGE.

" 'Judge Thomas B. Stuart of the district court dug his
official grave both wide and deep when he issued a writ
of *habeas corpus* on Thursday night for the liberation of
Deputy Secretary of State Wyatt from the jail of Arap-
ahoe county. He had no more legal authority to do this
than he would have had to issue a writ of *habeas corpus*
for the liberation of the Cronin murderers from the jail
of Cook county, Illinois. But he was not satisfied with
issuing the writ; he went further, and directed that a
bail bond in the penal sum of $1,000 should be taken,
subject to the approval of the sheriff of Arapahoe county.

" 'As we showed yesterday morning, a writ of *habeas
corpus* cannot be properly obtained in a contempt case in
Colorado. Section 360 of the Code of Civil Procedure
reads as follows: "The judgment and orders of the court

or judge, made in cases of contempt, shall be final and conclusive. The punishment shall be by fine or imprisonment, but no fine shall exceed the sum of $5,000."

" 'If Judge Stuart did not know of the existence of this statutory provision, and it is only charitable to presume that he did not, he was not properly informed regarding his powers and duties, and he should not have acted in ignorance. If he did know of its existence he showed very conclusively that he is wholly unfit for a place on the bench.   *   *   *

" 'Aside from the purely legal aspect of this case, Judge Stuart has left himself open to the severest condemnation for his course. Why should he have acted in the night on a case that might well have waited until morning. Mr. Wyatt was not suffering very seriously in jail. He was favored with the "parlor ward" in the jail through the partiality of the gang-ruled sheriff's office, and there could have been no injustice in letting him pay the penalty he had justly incurred by his outrageous refusal to let the grand jury see how much of the state's furniture had been stolen from the assembly building.

" 'No wonder the people lose faith in the administration of justice when courts and judges can be found ready to stretch their authority until it cracks in efforts to shield culprits from deserved punishment. No wonder the natural sense of justice of men often tempts them to take the law into their own hands for the punishment of criminals, when observation convinces them that the courts cannot be depended upon to insure the administration of justice. Judge Stuart knew, as every citizen of the state knew, that Mr. Wyatt was properly sent to jail by Judge Stone for a most flagrant case of contempt of court, and it was his business to know that the Civil Code absolutely forbade his interference in the case, even if his own sense of judicial propriety was not sufficient to keep

him from meddling.    Nor can he hope to escape the suspicion that the supposed political pull of the gang of which Johnny Wyatt is such a prominent member had some weight in procuring this writ.    Senator Wolcott, George Graham and all the other members of the gang are and have been working like beavers to prevent the infliction of any punishment upon the defendant for his offense, while the people are equally unanimous in their desire to see justice done.    Whether wittingly or unwittingly, Judge Stuart appears to have arrayed himself with the gang and against the people in this matter.

" 'Judge Stone has a duty to perform.   He cannot afford to let this matter rest, and he should take summary action to the fullest extent of his jurisdiction to send Mr. Wyatt back to jail this morning.    District Attorney Stevens declared last evening that he should move, as soon as the criminal court convenes to-day, for the return of the culprit to prison, and we shall see if he has the courage to do his whole duty in spite of the gang.

" 'When Johnny Wyatt was liberated from jail at a late hour on Thursday night, he gave the press to understand that Judge Stone had let him out.    This was not the case.    Judge Stone knew nothing about the jail delivery effected by Judge Stuart till he read of it in the papers yesterday morning, and he is justly incensed at Judge Stuart's unwarranted and unlawful action.   There can be no punishment for contempt of court if judges of equal jurisdiction assume to reverse each other's action in such cases.    Now let Judge Stone show that his court cannot be trifled with in this outrageous way.    Contempt of court is a serious offense, and judges should be careful not to provoke it.'

"Affiant further states that thereafter, and on Sunday, the 14th day of July, 1889, the said the Denver Republican contained certain other articles and comments relating to said court, the same being as follows, to wit:

### " 'Was Wyatt in Jail?

" ' *Belief that the Stubborn Deputy was· Never Locked Up — Excellent Authority for the Statement that Judge Stuart Laboriously Freed a Free Man — His Honor Appoints a Committee to Ascertain whether his Action was Foolish or Not — Judge Stone Urged to Resent the Indignity Heaped upon Him.*'

[Then follows a lengthy article, severely censuring Judge Stuart's action in the Wyatt case, which is omitted.]

### " ' Nothing Done Yesterday.

" ' *Judge Stone and the District Attorney Leave Johnny Alone.*

" ' Johnny Wyatt was not sent to jail yesterday, as anticipated. The district attorney did not issue a warrant for commitment as he said he would. Wyatt now laughs at law with impunity. Friday night the district attorney stated that Judge Stuart had exceeded his jurisdiction by permitting any prisoner held for contempt out on bail. As the court acted without authority, Wyatt, claimed the prosecution, had no legal right to be · anywhere except in the county bastile. With this view, which is supported by the bar generally, the district attorney decided that he would issue another warrant of commitment for Wyatt yesterday morning. He didn't do it when the morning came around.'

### " ' Judge Stuart Not Happy.

" ' When Judge Stuart perused the Republican yesterday morning he was evidently much put out, for the first thing he did at the convocation of court was to issue an order appointing Joel F. Vaile and Lafe Pence, two attorneys, as a committee to examine into the matters relative to the charges made against him. * * * If the Republican was guilty of contempt yesterday morn-

ing, it is still more in contempt this morning, for we not only do not take back a word we have already said in this matter, but repeat it all with emphasis. Judge Stuart committed a gross outrage when he let Wyatt out on bail, and he had neither authority nor excuse of a creditable kind for interfering in this case at all. His associates, Judge Allen and Judge Liddell, refused positively to issue the writ, and the attorneys of Wyatt did not deem it advisable to go near Judge Decker at all. This question is pretty well understood by the people, and we wish Judge Stuart joy of all the good he may get out of his appointment of a commission to investigate either himself or the Republican.'

"And affiant says that by the following statement in said last-named article contained, to wit: 'His associates, Judge Allen and Judge Liddell, refused positively to issue the writ,' it was falsely implied that said judges had considered the question whether the writ should or should not be issued, and had thereupon refused it, when in fact the petition of affiant had never been submitted to or considered by either of said judges.

"That upon said morning of July 14th said newspaper also contained a certain cartoon or illustration, intended and understood to apply to said cause and to this affiant, and to one of the judges of this court, the same being as follows, to wit: [At this point is inserted a large cartoon taken from the Denver Republican of July 14, 1889, in which, under the head-lines, '*The Tug of War — The People against the Gang*,' a rope-pulling contest is pictured, with Wyatt as the object of contention. Citizens are represented upon the one side as tugging at a rope around Wyatt's body, for the purpose of pulling him into jail, while upon the other, Judge Stuart and others are represented as pulling him in the opposite direction.]

"And this affiant, on information and belief, alleges that one Nathaniel P. Hill, as the president and the

owner of the majority of the capital stock of the Republican Publishing Company, and one Kemp G. Cooper, as the manager of said newspaper, and one William Stapleton, as the editor thereof, are each and all responsible for the publication of said several articles, and have permitted, authorized, inserted and caused the publication thereof, and that said newspapers containing said several articles were, under the procurement and cognizance of the said Nathaniel P. Hill, Kemp G. Cooper and William Stapleton, extensively and generally circulated in the city of Denver, and throughout the state of Colorado, on the dates of their publication as above set forth. That said articles and cartoons so published reflect upon the integrity and good faith of this court, and were designed, intended and calculated to hold up to public opprobrium one of the judges thereof. That the effect of the said publications was and is to prejudice the public with respect to the merits of a cause now pending for a hearing in this court, and yet undetermined, and that the same tend to corrupt the administration of justice. That said publications accuse the affiant of swearing falsely in regard to said cause, and are calculated to prevent a fair trial and determination of the same.

And affiant says that he is advised by counsel that in the permitting, authorizing and making of said publication as hereinbefore set out, the said Nathaniel P. Hill, Kemp G. Cooper and William Stapleton have been guilty of gross contempt of this court. And upon the facts here presented affiant asks that an order be made by this court requiring said Nathaniel P. Hill, Kemp G. Cooper and William Stapleton to appear in this court at a time in said order to be stated, and show cause, if any they can, why they should not be punished for contempt." (Here follows an order upon respondents to show cause why they should not be punished as for a contempt for said publications.)

### ANSWER OF RESPONDENTS.

"STATE OF COLORADO, *County of Arapahoe — ss.* In the district court in and for said county of Arapahoe.

"*The People of the State of Colorado ex rel. John J. Wyatt, Plaintiffs, vs. Nathaniel P. Hill, Kemp G. Cooper and William Stapleton, Defendants.*

"The said respondents, Nathaniel P. Hill, Kemp G. Cooper and William Stapleton, come and represent to this court that having, by an order of this court heretofore, and on the 15th day of July, A. D. 1889, been required to appear before the Honorable T. B. Stuart, one of the judges of said court, on Wednesday, the 17th day of July, A. D. 1889, at the hour of 10 o'clock A. M., and then and there to show cause, if any they have, why they and each of them shall not be punished for contempt of said court, a copy of which order is hereunto annexed, these respondents say: That from the said order, and an affidavit therewith served, purporting to have been subscribed by John J. Wyatt and placed on file of this court, it appears that the alleged contempt consists in the publication of certain articles in the Denver Republican on the 13th and 14th days of July, last aforesaid, and the said respondents protest against the said rule and order above mentioned, and the jurisdiction of this court to commit or proceed upon said affidavit for contempt of court against any of the said respondents for any matters stated in the said affidavit, and respectfully pray that they may be discharged therefrom, and in support thereof allege the following grounds:

"*First.* That the acts therein complained of are not, nor is either of them, a contempt of said district court.

"*Second.* That the said district court cannot legally punish for contempt a publication made in a newspaper, and not done in the immediate presence of the court.

"*Third.* That any such publications out of court, in relation to the court, or of any of its officers, or of any

cause pending therein, cannot be legally construed into a contempt of court in law, and the publisher cannot legally be punished therefor.

"*Fourth.* That these respondents admit that the Denver Republican is published by a corporation legally authorized to do business under the laws of the state of Colorado.

"*Fifth.* These respondents aver that the said Nathaniel P. Hill is not the president of said corporation, and that the said Nathaniel P. Hill neither incited, authorized or caused the publication of said articles, nor any of them, and aver that the first knowledge that the said Nathaniel P. Hill had of said articles, or any of them, was in the reading of the same in said papers after the same had been published; deny that the said articles, or the said cartoon, or any or either of them, reflect upon the integrity and good faith of said court; and aver that they were not devised, intended or calculated to hold up to public opprobrium one or any of the judges of said court; deny that the effect of said publications, or any of them, was or is prejudicial to the merits of any cause then pending before said court, or to prejudice the public in regard thereto, or that the same, or any of them, were intended to obstruct the administration of justice.

"*Sixth.* These respondents aver that they have not, nor has any of them, been guilty of disorderly, contemptuous or insolent behavior in the presence of said court or in chambers, or towards any referee or arbitrator, tending to interrupt the course of a trial, reference or arbitration or other proceeding. They aver that they have not been guilty of disobedience to any lawful writ, order, rule or process issued by said court, or any judge thereof, in chambers or otherwise; that they have not been guilty of disobedience of any subpœna or in any manner refused to obey any order of the court or of any judge thereof; that said respondents nor either of them have rescued any person or property in the custody of any

officer, by virtue of any process of said court, or of the judge thereof, nor have they or either of them been guilty of a breach of the peace or of boisterous conduct, or of violent disturbance in the presence of the court, or in its immediate vicinity, tending to interrupt the course of a trial or judicial proceeding, and that they have not been guilty of any conduct calculated to retard the due administration of justice.

"*Seventh.* And these respondents further answering say that a fair construction of said articles, or any of them, will not warrant an inference of any imputation or charge against the good faith and integrity of said court, or of any of the judges thereof, and that they nor either of them were so designed.

"*Eighth.* And said respondents further say and insist that they had and still have the right, as editors, managers and publishers of said paper, to examine, criticise, comment upon or condemn publicly in said newspaper the proceedings of any and every department of the government of this state, and that they are not responsible for the truth in such publications, nor for the motives with which they were or are made by summary process for contempt; and that under the constitution of the state of Colorado, which guaranties to the citizen freedom of speech and the right to write and publish whatever he will on any subject, these respondents, not being moved by any of the matters charged in said affidavit, as the same are therein stated and set forth, but with the purpose of advancing if possible the due administration of the laws in the matters in controversy, published the said articles as they lawfully might. And these respondents further say that no disrespect was intended by said articles to said court, or any judge thereof, and that a fair construction thereof will not warrant an inference to that effect; but that the same were written and published with the just, proper and legal motives aforesaid, and concerning an act of a judge already performed."

The matter was thereafter heard by the court upon the foregoing affidavit and answer. This hearing resulted in the discharge of the defendant Hill, but the defendants Cooper and Stapleton, plaintiffs in error, were adjudged guilty of contempt of court and sentenced to pay a fine of $300 each therefor. To review the judgment of the district court plaintiffs in error bring the proceeding before this court by writ of error.

Mr. L. B. FRANCE, for plaintiffs in error.

THE ATTORNEY-GENERAL, Mr. H. RIDDELL and Messrs. WOLCOTT & VAILE, for defendants in error.

MR. JUSTICE HAYT delivered the opinion of the court.

The sentence being for contempt, our right to review the action of the court below is challenged in consequence of the following provision of the statute: "The judgment and orders of the court or judge made in cases of contempt shall be final and conclusive." Sec. 360, Civil Code 1883.

While we cannot place such a construction upon the language of the act as would render the statute meaningless, it would, on the contrary, be absurd to suppose that every order made by a court or judge in cases of contempt would be beyond review and binding, whether the court had jurisdiction or whether it had not. A brief review of the law as it was prior to the adoption of this provision will aid us in determining its meaning. "We shall never know," said Lord Coke, "the true reason of the interpretation of the statutes, if we know not what the law was before the making of them."

At common law judgments of superior courts of record in matters of contempt were final, and not revisable in any other court upon appeal or writ of error; but upon *habeas corpus* the defendant was entitled to be discharged, if in commitment under a sentence absolutely void for

the want of jurisdiction in the court rendering the same. In this country, in the absence of statute, it has been decided that no appeal or writ of error would lie to a judgment for contempt; but it has been held that the remedy by prohibition might be resorted to in case the court was about to exceed its jurisdiction, and also that a judgment in contempt, rendered without jurisdiction, might be set aside upon *certiorari;* or, if the defendant was in custody upon such judgment, he might be discharged upon *habeas corpus.* And by statute in some states the additional remedies by appeal and writ of error have been given. The tendency of the American courts has, however, been to limit the investigation, even upon appeal, to errors of law only, and generally to the jurisdiction of the court. Rap. Contempt, § 149. Thus it will be seen that contempt orders and judgments are not ordinarily revisable for mere error, but may be set aside for want of jurisdiction of the court over the subject-matter, over the defendant, or to render the particular judgment or order complained of. Rap. Contempt, § 141 *et seq.; Ex parte Reed,* 100 U. S. 13–23; Hayne, New Trials & App. §§ 98–198; 2 Bish. Crim. Law, § 268; *Vilas v. Burton,* 27 Vt. 56; *People v. Kelly,* 24 N. Y. 74; *Ex parte Adams,* 25 Miss. 883; *Phillips v. Welch,* 12 Nev. 158; *State v. Galloway,* 5 Cold. 337.

Bishop, in the section cited *supra,* says: "It is not within the plan of this volume to discuss questions of practice; yet it may be observed that the very nature of a contempt compels the court against which it is committed to proceed against it, and, if the court has jurisdiction, precludes any other or superior tribunal from taking cognizance of it, whether directly or on appeal or otherwise. Under peculiar provisions of law, however, in some of the states, and the pressure of modern opinions, the superior courts do in a measure, not fully, correct errors of the inferior ones in this matter."

In *Vilas v. Burton, supra,* it is said: "The English

courts have always held that proceedings for contempt in one court, where the court has jurisdiction of the sub-ject-matter and of the parties, are not revisable in any other court. * * * And no cases are brought to light where such proceedings in the superior court have ordi-narily been held revisable, unless where the proceedings were so irregular as to be against law, and to give the court no proper jurisdiction."

Upon an application to discharge a party committed for contempt upon *habeas corpus,* the supreme court of New York in *People v. Kelly, supra,* said: "The ques-tion whether the alleged offender really committed the act charged will be conclusively determined by the order or judgment of the court; and so with equivocal acts, which may be culpable or innocent according to the cir-cumstances; but where the act is necessarily innocent or justifiable, it would be preposterous to hold it a cause of imprisonment."

In *Phillips v. Welch, supra,* it was held that the re-view must be limited to the question of jurisdiction, and that no error of law or fact not jurisdictional in char-acter could be considered; and this is in harmony with the current of decisions in California. In a few cases appeals from contempt judgments have been allowed in that state, but even upon appeal the inquiry has been confined to the question of the jurisdiction of the court entering the judgment. While decisions may be found sanctioning the extension of the review beyond the ques-tion of jurisdiction, such decisions have usually been based upon statutory provisions authorizing the exten-sion; and our conclusion from the authorities is that the code provision quoted has no reference to the mode of review, whether by writ of error or otherwise, but that it must be construed as a limitation upon the authority of this court in contempt proceedings to extend its in-quiry beyond the question of the jurisdiction of the court below. Hayne, New Trials & App., *supra; Ex parte*

*Perkins,* 18 Cal. 60; *People v. O'Neil,* 47 Cal. 109; *Roe v. Superior Court,* 60 Cal. 93.

When an affidavit is presented as the basis of a proceeding for contempt, the court must, in the first instance, examine the same, and if the facts presented do not show that a contempt has been committed, the court will be without jurisdiction to proceed; but if the facts are sufficient, the court may take jurisdiction, and its subsequent orders will not be reviewed for mere error. We are not to be understood, however, as saying that a court, after once acquiring jurisdiction, might not so far depart from the forms prescribed by law in the subsequent proceedings as to exceed its jurisdiction, and thus vitiate its judgment. The practice of bringing up for the consideration of this court contempt proceedings by writ of error from the final judgment has been followed for many years, and we are not now disposed to consider favorably objections thereto. In some instances the facts necessary for the information of the court, to enable it to determine the question of jurisdiction in reference to a particular cause, do not appear upon the record proper, and in such cases the writ of error is peculiarly appropriate. Aside from this there is no authority given this court by statute to require a bond pending a determination of cases upon *certiorari,* while to enable the defendant to sue out a writ of *habeas corpus* he must be actually in custody at the time. The remedy by writ of error, however, as we have it, has been found ample to meet all cases, as it furnishes a remedy when either of the other writs might have been resorted to. These are additional reasons in favor of this mode of review, as in this state no appeal will lie from judgments in contempt cases. But the review upon the writ cannot be extended further than an inquiry into the jurisdiction of the lower court. *People v. District Court,* 6 Colo. 534; *Teller v. People,* 7 Colo. 451; *People v. O'Neil,* 47 Cal. 109; *Romeyn v. Caplis,* 17 Mich. 455.

Was the district court justified, under the law, in holding the acts set forth in the affidavit, upon which the contempt proceedings were founded in the present instance, sufficient to constitute a contempt of court? Contempts are of two kinds,— direct, *i. e.*, such as are committed in the immediate view and presence of the court or judge at chambers; consequential, or, as they are now usually termed, constructive contempts, *i. e.*, such as are committed outside of the view and presence of the court or judge at chambers.

The acts here complained of belong to the latter class, if to either. They consist of the publication in a newspaper, of general circulation in the place where the court was being held, of such articles in reference to a cause pending as were calculated to interfere with the due administration of justice, as it is said. It is admitted that by the common law such acts were held to constitute a contempt of court; but respondents challenge the authority of the court, under our constitution and statutes, to punish as for a contempt any publication not made in the presence of the court, whatever be the language used. In support of this position the following cases are cited: *Stuart v. People,* 3 Scam. 405, 406; *People v. Wilson,* 64 Ill. 208; *Galland v. Galland,* 44 Cal. 478; *State v. Dunham,* 6 Iowa, 245; *Ex parte Hickey,* 4 Smedes & M. 751; *Storey v. People,* 79 Ill. 50.

The first four of these cases are cited for the purpose only of showing that statutes such as ours must be treated as a limitation upon the common-law powers of the court in matters of contempt. And while the opinions are from courts of eminent authority and learning, the doctrine announced is not only contrary to the weight of authority, but the question is *stare decisis* with us. In the case of *Hughes v. People,* 5 Colo. 445, it was expressly decided that the statute of this state was not a limitation upon the power of the courts to punish for contempts. This is in accordance with a long line of ad-

judicated cases, and we see no reason to change the conclusion then reached.   The decision in the *Hughes Case* is commented upon and followed in the recent case of *State v. Frew*, 24 W. Va. 416, where the authorities are collated and reviewed.

While the legislature in this state may increase or diminish the number of judicial districts, the district court itself is created and its jurisdiction fixed by the constitution.   By the express letter of that instrument it is given "original jurisdiction of all causes, both at law and in equity."   Art. 6, § 11, Const.   The authority of the legislative department of the government to take away the inherent power of such a court to punish for contempts was doubted in *Ex parte Robinson*, 19 Wall. 505, and expressly denied in the following cases: *State v. Morrill*, 16 Ark. 403; *State v. Frew, supra*.

The power of the legislature over the subject is not, however, here in question, as we can find nothing in the statutes which can be considered an attempt to take away such authority from the district courts of this state.

The other two cases cited by counsel for respondents, viz., *Ex parte Hickey* and *Storey v. People*, deny the authority of the courts to punish as for a contempt the writers or publishers of newspapers responsible for articles appearing in the columns of such papers, on account of the constitutional provision in their respective states guarantying the freedom of speech and of the press. Hence, it is argued in this case that the judgment of the court below is contrary to both the spirit and letter of section 10, article 2, of our state constitution: "That no law shall be passed impairing the freedom of speech; that every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

In the case of *Ex parte Hickey, supra,* the alleged contempt consisted in the publication of a certain newspaper article severely censuring the judge of that court for admitting a defendant charged with murder to bail. It was in reference to an act fully performed, although the trial of the defendant upon the indictment had not yet been called. The publisher, having been sentenced as for a contempt of court, and committed to jail, obtained a writ of *habeas corpus* from one of the judges of the supreme court. The judge, in discharging the petitioner from custody, used this language: "Our constitution has declared that 'every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty.' Art. 1, § 6. The reflections of the petitioner upon the circuit judge of Warren county, as set forth in the petition complained of, when judged by the practice and assumptions of the English and some of the American courts, constitute an undoubted contempt of an aggravated character; but when passed through the crucible of our state constitution, instead of a contempt of court, they become a mere libel on the functionary, and subject only to the punishment prescribed by law for the latter offense."

This was the opinion of a single judge. Afterwards, however, in another case in the same state, the supreme court upon appeal held: "The right of punishing contempts by summary conviction is a necessary attribute of judicial power, inherent in all courts of justice from the very nature of their organization, and essential to their existence and protection, and to the due administration of justice. It is a trust given to the courts, not for themselves, but for the people, whose laws they enforce and whose authority they exercise; and each court has the power for itself finally to adjudicate and punish contempts without interference from any other. The right to punish for contempts extends not only to acts which directly and openly insult or resist the powers of the

court or the persons of the judges, but to indirect and constructive contempts, which obstruct the process and degrade the authority of the court." *Watson v. Williams*, 36 Miss. 331.

In the case of *Storey v. People, supra*, the language complained of was in reference to acts of the grand jury fully completed, as was expressly declared in the opinion of the court: " We do not understand the articles as having a tendency directly to impede, embarrass or obstruct the grand jury in the discharge of any of its duties remaining to be discharged after the publications were made. No allusion is made to any matter upon which the members were thereafter to act, and there could therefore, of necessity, be no attempt to interfere with the exercise of their free and unbiased judgments as to such matters."

The court, however, said, in speaking of a constitutional provision similar to the one we have in this state: " This language, plain and explicit as it is, cannot be held to have no application to courts, or those by whom they are conducted. The judiciary is elective, and the jurors, although appointed, are, in general, appointed by a board whose members are elected by popular vote. There is therefore the same responsibility, in theory, in the judicial department that exists in the legislative and executive departments to the people, for the diligent and faithful discharge of all duties enjoined on it; and the same necessity exists for public information with regard to the conduct and character of those intrusted to discharge those duties, in order that the elective franchise shall be intelligibly exercised, as obtains in regard to the other departments of the government. When it is conceded that the guaranty of this clause of the constitution extends to words spoken or published in regard to judicial conduct and character, it would seem necessarily to follow that the defendant has the right to make a defense which can only be properly tried by a jury, and

which the judge of a court, especially if he is himself the subject of the publication, is unfitted to try."

Prior to and at the time of the adoption of these constitutional provisions, courts had at common law the undoubted authority to punish summarily, without a trial by jury, both constructive and direct contempts. And it is difficult to see how the provisions in reference to jury trials in suits and prosecutions for libel can be so construed as to either extend this right to contempt proceedings, or to support the argument that, as jury trials are not allowed in matters of contempt, therefore the constitution takes away the power to punish as for a contempt for matters spoken, written or published beyond the immediate view or presence of the court, although presenting no barrier to summary punishment for direct contempts. No court has ever yet held that the right of trial by jury extends to contempt proceedings, and to thus decide would defeat the very object of the power. So to hold would place it in the power of a vicious person so to conduct himself as to prevent any kind of a trial. As we have seen, the power to punish summarily for contempts is essential to the very existence of courts. Cooley, Const. Lim. p. 390, note 3. And if the framers of our constitution desired either to take away such power or to abridge its exercise, we have no doubt that such intention would have been expressed in language that could not have been misunderstood. Similar constitutional provisions in reference to freedom of speech and of the press exist in almost every state of the Union, and we know of no other state where the court of last resort has arrived at a result similar to that reached by the supreme court of Illinois in the case of *Storey v. People, supra.* On the other hand, in several of the states a different conclusion has been reached, and the authority of the courts to punish summarily, as for a contempt, parties publishing articles in reference to causes pending, when such publications tend to corrupt

or embarrass the administration of justice, has been expressly upheld, notwithstanding the existence of such constitutional provisions. *State v. Morrill, supra; Myers v. State,* 22 N. E. Rep. 43; *State v. Frew, supra; Sturoc's Case,* 48 N. H. 428; 2 Bish. Crim. Law, § 259. In *State v. Morrill, supra,* the court said: "The counsel for the defense supposed that the power of the courts to punish as for contempt the publications of libels upon their proceedings was cut off by the seventh section of the bill of rights, which is in these words: 'That printing presses shall be free to every person, and no law shall ever be made to restrain the rights thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.' The last clause of the section, 'being responsible for the abuse of that liberty,' is an answer to the argument of the learned counsel.

It is a well known fact that the bench and the bar have been, in this and all other countries where the law has existed as a distinct profession, the ablest and most zealous advocates of liberal institutions, the freedom of conscience, and the liberty of the press; and none have guarded more watchfully the encroachments of power on the one hand, or deprecated more earnestly tendencies to lawless anarchy and licentiousness on the other. The freedom of the press, therefore, has nothing to fear from the bench in this state. No attempt has ever been made, and we may venture to say never will be, to interfere with its legitimate province on the part of the judiciary by the exercise of the power to punish contempts. The object of the clause in the bill of rights above quoted is known to every well-informed man. Although the press is now almost as free in England as it is in this country, yet the time was, in bygone ages, when the ministers of the crown possessed the power to lay their hand upon it and hush its voice when deemed

necessary to subserve political purposes. A similar clause has been inserted in all the American constitutions to guard the press against the trammels of political power, and secure to the whole people a full and free discussion of public affairs."

The latest decision that we have been able to find upon the subject is from the supreme court of the state of Ohio in the case of *Myers v. State, supra* (1889). The facts in the case were in some respects similar to those in the case at bar. The plaintiff in error, Myers, a newspaper correspondent, having been indicted by the grand jury, wrote and caused to be published in a Cincinnati daily paper, having a general circulation in the place where the court was being held, and while the case was still pending, an article charging that the grand jury finding the indictment was called by the presiding judge "for a special partisan purpose," and "never honestly drawn from the box;" that the grand jury was packed by the presiding judge, co-operating with the clerk, and that the writer had been by this method indicted "by rascally and infamous methods;" and the court said:

"The article was a libel upon the presiding judge, but that alone did not form the basis of the information. The intention of the publication was to insult and intimidate the judge, degrade the court, destroy its power and influence, and thus to bring it into contempt; to inflame the prejudices of the people against it; to lead them to believe that the trial then being conducted was a farce and an outrage, which had its foundation in fraud and wrong on the part of the judge and other officers of the court, and, if communicated to the jury, to prejudice their minds and thus prevent a fair and impartial trial. Besides, the tendency was, when read by the judge, to produce irritation, and, to a greater or less extent, render him less capable of exercising a clear and impartial judgment. It therefore tended directly to obstruct the administration of justice in reference to the case on trial,

and its publication was a contempt of court. The fact that, before its publication, a professional opinion was given that the publication would not be a contempt, does not change the essential character of the defamatory article, nor relieve the respondent of responsibility for its origin and dissemination."

In *State v. Frew, supra* (1884), the defendants were punished as for a contempt of court for the publication of a libel upon the court and judges; the publication having been made in the city where the supreme court was sitting, and in reference to a cause then pending and undetermined in said court. The court, after a careful review and analysis of the authorities, said: "In every aspect of the case the publication is clearly a contempt of this court. Can such a publication be palliated or excused? Far be it from us to take away the liberty of the press, or in the slightest degree to interfere with its rights. The good of society and of government demands that the largest liberty should be accorded the press, which is a power and an engine of great good; but the press itself will not for a moment tolerate such licentiousness as is exhibited in said editorial. The press is interested in the purity of the courts, and, if it had no respect for the judges on the bench, it should respect the court; for when the judges now on the bench shall be remembered only in the decisions they have rendered, the court will still remain. It never dies. It is the people's court; and the press, as the champion of the people's rights, is interested in preserving the respect due to the court."

At the time these decisions were rendered both Ohio and West Virginia had constitutional provisions similar to the provision of the Colorado constitution quoted, and in the Ohio case it does not appear that the provision was ever considered by court or counsel as forming any barrier to the punishment as for a contempt, while in the West Virginia case it was expressly determined that

the conviction and punishment were in accordance with the constitution of that state. Judge Cooley, in speaking of these constitutional provisions, says: "We understand liberty of speech and of the press to imply not only liberty to publish, but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords. For these standards we must look to the common-law rules which were enforced when the constitutional guaranties were established, and in reference to which they have been adopted." Cooley, Const. Lim. *422. Turning to Blackstone as an authority as to what acts constituted constructive contempt at common law, we find among those enumerated the following: "By speaking or writing contemptuously of the court or judges, acting in their judicial capacity; by printing false accounts (or even true ones without proper permission) of causes then depending in judgment; and by anything, in short, that demonstrates a gross want of that regard and respect which, when once courts of justice are deprived of, their authority (so necessary for the good order of the kingdom) is entirely lost among the people." 4 Bl. Comm. *285.

We quote this paragraph from Blackstone only for the purpose of showing the extent to which the summary punishment for contempt may be extended without infringing upon the constitutional guaranties of freedom of speech and of the press as defined by Judge Cooley; but it must not for this reason be understood that we claim the power of the courts to punish as for contempts is now as indefinitely broad as stated by Blackstone. However, upon principle and authority, we must hold that at common law superior courts of record have the inherent power summarily to convict and punish as for a contempt of court those responsible for articles published in reference to a cause pending, when such articles are calculated to interfere with the due administration

of justice; and that neither the statutes of this state nor the constitutional provisions quoted present any barrier to the exercise of such powers by the district courts of the state, but that such power is inherent in those courts.

In the articles set forth in the affidavit in the case upon which the contempt proceedings are based, it is charged that the petitioner, "Johnny Wyatt, swore to a gauzy fiction." The judge of the court in issuing the writ of *habeas corpus* is referred to as "the tool," and charged with stepping outside of legal precedent "to keep precious Johnny out of jail for two or three days;" and in various subdivisions of the same article such phrases as "Back to jail, Johnny," "A judicial outrage," etc., are made conspicuous, and the judge is threatened with political punishment for a preliminary judicial act taken by him in the cause, in this language: "Judge Thomas B. Stuart of the district court dug his official grave both wide and deep when he issued a writ of *habeas corpus* on Thursday night for the liberation of Deputy Secretary of State Wyatt from the jail of Arapahoe county." And it is also said: "Nor can he hope to escape the suspicion that the supposed political pull of the gang, of which Deputy Wyatt is such a prominent member, had some weight in procuring this writ." And a demand is made upon Judge Stone of the criminal court to "take summary action to the fullest extent of his jurisdiction to send Mr. Wyatt back to jail."

In the issue of July 14th the following appears: "If the Republican was guilty of contempt yesterday morning, it is still more in contempt this morning, for we not only do not take back a word we have already said in this matter, but repeat it all with emphasis. Judge Stuart committed a gross outrage when he let Wyatt out on bail, and he had neither authority nor excuse of a creditable kind for interfering in the case at all." It is further charged that Judge Stuart's associates, "Judge Allen

and Judge Liddell, refused positively to issue the writ," *the falsity of which charge is set forth in Wyatt's petition, and no issue taken thereon by respondents in their answer.* And not less objectionable than these articles is the cartoon entitled "The Tug of War — The People against the Gang."

There can be no doubt that the tendency of the articles and cartoon exhibited in this affidavit, responsibility for which plaintiffs in error admit by their answer, was to prejudice the public as to the merits of a cause then pending and undisposed of; to degrade the court and judge before whom the same was pending; and to impede, embarrass and defeat the administration of justice in reference thereto. In these articles the petitioner, Wyatt, is charged with perjury; grave reflections are cast upon the court and upon the judge thereof, and the whole tendency of the language employed was to inflame the popular mind against both the petitioner and the judge, for the evident purpose of coercing the latter into sending the former "back to jail."

Parties have a constitutional right to have their causes tried fairly in court, by an impartial tribunal, uninfluenced by newspaper dictation or popular clamor. What would become of this right if the press may use language in reference to a pending cause calculated to intimidate or unduly influence and control judicial action? Days, and sometimes weeks, are spent in the endeavor to secure an impartial jury for the trial of a case; and, when selected, it is incumbent upon the court to exercise the utmost care in excluding evidence of matters foreign to the issues involved, so that the minds of the jurors may not perchance be unduly biased or prejudiced in reference either to the litigants or to the matters upon trial. But if an editor, a litigant, or those in sympathy with him, should be permitted, through the medium of the press, by promises or threats, invective, sarcasm or denunciation, to influence the result of the trial, all the

care taken in the selection of the jury, as well as the pre-
caution used to confine their attention at the trial solely
to the issues involved, will have been expended in vain.

We would not for a moment sanction any contraction
of the freedom of the press.    Universal experience has
shown that such freedom is necessary to the perpetuation
of our system of government in its integrity; but this
freedom does not license unrestrained scandal.    By a
subsequent clause of the same sentence of our state con-
stitution in which the liberty is guarantied, the responsi-
bility for its abuse is fixed.    With us the judiciary is
elective, and every citizen may fully and freely discuss
the fitness or unfitness of all candidates for the positions
to which they aspire; criticise freely all decisions ren-
dered, and by legitimate argument establish their sound-
ness or unsoundness; comment on the fidelity or infidelity
with which judicial officers discharge their duties,— but
the right to attempt, by wanton defamation, to prejudice
the rights of litigants in a pending cause, degrade the
tribunal, and impede, embarrass or corrupt that due ad-
ministration of justice which is so essential to good gov-
ernment, cannot be sanctioned.    2 Bish. Crim. Law (7th
ed.), § 259.

It was said in argument by counsel for respondents
"that by the common law every judge was regarded as
the direct representative of the sovereign, and upon this
fiction the power to punish for contempt was based."
With us the people have been substituted for the crown.
The courts are created by the people, and are dependent
upon the popular will for a continuation of the powers
granted.    They are the people's courts, and contemptuous
conduct towards the judges in the discharge of their offi-
cial duties, tending to defeat the due administration of
justice, is more than an offense against the person of the
judge,— it is an offense against the people's court, the
dignity of which the judge should protect, however will-
ing he may be to forego the private injury.

It has been urged in argument that Judge Stuart had no jurisdiction in the *habeas corpus* proceedings to release Wyatt from arrest under the warrant of commitment from the criminal court. We deem it sufficient for the present to say that, the proceedings in the *habeas corpus* case not having been made a part of this record, we have no means of determining, except by legal presumption, the question of such jurisdiction. The record before us does not disclose for what offense Wyatt had been imprisoned by the criminal court; hence we express no opinion upon the action of Judge Stuart in the premises. By statute, the district courts of this state, and the judges thereof, are expressly given general jurisdiction in *habeas corpus* cases, *i. e.*, the power to issue the writ is given generally; and if there were facts set forth in the petition upon which Judge Stuart issued the writ affirmatively showing that he had no jurisdiction in the particular case, and respondents desired to take advantage of this, they should have incorporated such petition in this record. This has not been done.

In the absence of such showing, the jurisdiction of the district judge to issue the writ in the particular case must be presumed. Gen. St. § 1609; *People v. District Court, supra; Railroad v. Nicholls*, 8 Colo. 188. The judgment is accordingly affirmed.

*Affirmed.*

MR. JUSTICE ELLIOTT. I concur in the opinion of the court upon the main question involved in this case, and in the conclusion. Counsel for respondents has chosen to rest the defense in this proceeding mainly upon the ground that the publishers of newspapers have a constitutional right to assail the integrity and impugn the motives of a judge in relation to his judicial action, even in cases pending and undisposed of, without being amenable to contempt proceedings therefor. That such a doctrine is opposed to sound reason as well as the great

weight of authority is clearly shown in the opinion of Mr. Justice HAYT, filed herein. The idea may be conveyed by the opinion of the court, though not necessarily so intended, that a district court or a district judge has authority by *habeas corpus* to release prisoners under commitment for contempt by another court or judge of concurrent jurisdiction. I am unwilling that such a rule of practice should be sanctioned in our jurisprudence, even by inference, as such a rule, if followed, would lead to judicial anarchy.

It was assumed in the argument of this case without question, and by fair implication the record may be said to show, that the relator was under commitment by the criminal court for contempt against its authority in a matter wherein the criminal court had jurisdiction. This was repeatedly asserted in the publications complained of, which assertions were incorporated in the record as a part of the affidavit of the relator, and are not controverted in any way; moreover, the record in this case nowhere discloses that the criminal court had acted without jurisdiction in the matter of relator's commitment; and hence its jurisdiction in the premises must be presumed. Under such circumstances, I am of the opinion that no district court or judge could lawfully discharge the relator from such commitment. Whether he could have been relieved by a higher tribunal need not now be considered.

This court has always, as in this case, manifested extreme delicacy in interfering with the judgments of other courts in contempt cases. It makes use of the writ of error therefor under careful restrictions.

In Church, Hab. Corp. (page 305), it is said: "One court of general jurisdiction should not review the proceedings of another on the writ of *habeas corpus*. The principles of comity should prevail."

In Rap. Contempts (sec. 155), it is said: "The writ of *habeas corpus* is a collateral remedy, and under the well-

established rule that a judgment of a court of competent jurisdiction, upon a matter within that jurisdiction, cannot be collaterally impeached, it results that, no question of jurisdiction being raised or involved, a conviction or commitment for contempt cannot be reviewed by means of this writ; for it is well settled that an order of committal for contempt is in the nature of a judgment, and the person committed thereunder is committed in execution. If, therefore, the court have jurisdiction of the person of the defendant, and of the subject-matter out of which the alleged contempt arises, he can no more get relief on *habeas corpus* than he could if his committal had been in execution of a judgment founded upon a verdict in an ordinary prosecution for crime. If the court had jurisdiction, the rule making every superior court of record or legislative body the exclusive judge of contempts against its own authority and dignity closes the door to a review by this writ except in cases where excess of jurisdiction is clearly apparent."

Hurd, Hab. Corp. (412) says: " The right of punishing for contempts by summary conviction is inherent in all courts of justice, and essential to their protection and existence. A commitment under such conviction is a commitment in execution, and the judgment of conviction is not subject to review in any other court unless specially authorized by statute. It cannot be attacked under the writ of *habeas corpus* except for such gross defects as render the proceeding void."

Again, the same authority, speaking of summary convictions, applicable, though not limited, to contempt cases, on pages 404 and 405, says: " Where a person is committed in execution under such a conviction, he cannot claim, under the act 31 Car. II., nor under the acts of several of the states, as we have seen, to be discharged under a writ of *habeas corpus*. Courts, however, possessing a common-law jurisdiction over the writ, or judges or other officers upon whom jurisdiction is con-

ferred without such limit, may, in exercise of such com-
mon-law or unrestricted jurisdiction, discharge the pris-
oner from such commitment if it be fatally and incurably
defective.   But as we have also seen, courts are reluctant
to interfere then under the writ of *habeas corpus* with-
out having the conviction before them; and they never
do for mere error or irregularity, unless they have the
record before them in such form as to enable them to
act expressly and conclusively upon such error or irreg-
ularity.

" Hence the importance of the writ of *certiorari*, and
hence, also, the necessity of applying for relief from im-
prisonment in such cases to a court which, by its consti-
tution and relation, possesses a corrective or revisory
jurisdiction over the conviction, so that if it be erroneous
it may be reversed, and then the prisoner be discharged."

Again, Rap. Contempts, § 155, still speaking of the re-
view of contempt cases by *habeas corpus,* says: "It there-
fore becomes clear that the question of relief or no relief,
in these cases, by means of the writ of *habeas corpus,*
depends upon the power of the court issuing the writ to
inquire into and judge of the extent and limits of the
jurisdiction of another court.   Upon this subject the ad-
judged cases, apparently so harmonious in their statement
of the general rule, are, upon a closer examination, per-
plexing and inconclusive.   In cases where the court issu-
ing the writ is clothed by law with appellate or 'superin-
tending jurisdiction over the tribunal which committed
the petitioner, there seems to be comparatively little dif-
ficulty in reconciling the adjudications."

From an examination of the adjudged cases, I am sat-
isfied that the simpler, safer and better rule in reference
to the review of contempt proceedings is, as stated by the
last-named author, "That one court should not judge the
jurisdiction of another tribunal of co-ordinate authority
and dignity."   *Ex parte Watkins*, 3 Pet. 193; *Ex parte
Kearney,* 7 Wheat. 38; *Ex parte Reed,* 100 U. S. 13;

*Davison's Case*, 13 Abb. Pr. 129; *Clark v. People*, Breese, 340; *Ex parte Thatcher*, 2 Gilman, 167; *State v. Towle*, 42 N. H. 540; *Robb v. McDonald*, 29 Iowa, 330; *In re Bissell*, 40 Mich. 63; *Shattuck v. State*, 51 Miss. 50; *Phillips v. Welch*, 12 Nev. 158; *State v. Galloway*, 5 Cold. 326; *Ex parte Farnham*, 3 Colo. 545.

It is true our statute in general terms confers jurisdiction in *habeas corpus* cases upon district courts and district judges.     Nevertheless, there must, in the nature of things, be some limitation to the exercise of such power, else the unseemly spectacle might be presented of one district court releasing prisoners committed by another district court, or even by the supreme court itself.     The criminal courts have jurisdiction in many cases concurrent with the district courts; and in all matters pertaining to the exercise of their lawful jurisdiction they should be upheld accordingly.

Respondents had an undoubted right to question the jurisdiction of the district court in the premises, and to criticise the issuance of the writ of *habeas corpus*, in temperate and respectful language, as much as they pleased; but they had no right, at least while the proceedings were pending, to subject the judge to ridicule, or to make insinuations against his good faith in connection therewith; for whether he had jurisdiction or not, he must, in any event, pass upon the question of such jurisdiction,—a matter of some difficulty, as we have seen,—and in so doing he should have been permitted to act uninfluenced by fear of injury to his reputation or other unworthy motive. *Williamson's Case*, 26 Pa. St. 9.     The decision in the case of *People v. District Court*, 6 Colo. 534, is not in conflict with the views here expressed, but rather in support of them, when the whole opinion is considered.

*Affirmed.*