## No. 11,588.

FORT *v.* PEOPLE EX REL. CO-OPERATIVE FARMERS' EXCHANGE. .

Decided May 9, 1927.

Plaintiff in error was adjudged guilty of contempt.

*Reversed.*

1.  CONTEMPT—*Jury Trial.* One charged with contempt of court is not entitled to a jury trial.

2.  *Review.* The Supreme Court in reviewing a contempt judgment is confined to the inquiry, whether the trial court had jurisdiction and regularly pursued its authority.

3.  *Jurisdiction.* In contempt proceedings, if the petition and affidavit state facts which if true show that a contempt was committed, the court acquires jurisdiction, otherwise not.

4.  INJUNCTION—*Decree—Construction.* An injunctive order prohibiting interference with business of an exchange, construed to prohibit only interference with contracts of the exchange.

5.  *Marketing Contracts.* Knowingly to induce a member of a co-operative marketing association to break his marketing contract with the association is a misdemeanor which may be restrained by order of court.

6.  *Trade Competition.* Lawful interference with business as the result of the economic law of competition cannot be enjoined.

7.  *Constitutional Law—Freedom of Speech.* In doubtful cases an injunctive order should not be so construed as to forbid the dis-

cussion of matters of public interest, in view of article II, section 10, of the Constitution permitting freedom of speech.

8.    *Order—Construction.* The publishing of newspaper articles charging marketing exchange officials with price cutting held not to violate an injunctive order prohibiting interference with business.

*Error to the District Court of Weld County, Hon. Robert G. Smith, Judge.*

Messrs. Allen, Webster & Drath, for plaintiff in error.

Mr. Donald C. McCreery, Mr. Hubert D. Waldo, Jr., for defendant in error.

*Department Two.*

Mr. Justice Butler delivered the opinion of the court.

The plaintiff in error was adjudged guilty of contempt. He seeks a reversal of the judgment.

The Co-operative Farmers' Exchange, as plaintiff, obtained a temporary injunction restraining Fort, the defendant below, from inducing the breach of or the interference with the Exchange's marketing contracts, and the interference with "any of the business of the Exchange"; particularly that the defendant refrain from buying or attempting to buy cabbage from any person having a marketing contract with the Exchange, with certain exceptions not necessary to repeat here. Thereafter the plaintiff filed a petition stating that the defendant had violated the injunction in the particulars specified in the accompanying affidavit of one Northway. That affidavit, so far as it states matters material to this decision, is as follows:

" * * * that, as defendant is informed and believes and so alleges, * * * Fort has utterly failed, neglected and refused to obey said order; that he does business

in the handling and selling of vegetables, under the firm name of 'Celeryvale Farm'; that on Tuesday, August 11th, the Brighton Blade, a semi-weekly newspaper published in Brighton, Colorado, contained on page 1 of said newspaper, a certain article entitled 'Who Cut Cabbage?' and that also, on the fourth page of the same issue of said newspaper, appeared an advertisement under the head '$50,000 Lost,' all of which appear in Exhibit 'A.' That affiant on information and belief alleges that Z. J. Fort is responsible for the publication of said article and advertisement, and that the said article and advertisement with the cognizance of the said Fort was extensively circulated in the counties of Weld and Adams, and elsewhere in the State of Colorado. Affiant further states that by long and close association, any reference or statement in connection with the marketing of cabbage, the name of this affiant or W. E. Northway Marketing Co. so-called, is commonly and universally taken and understood to be the Cabbage Exchange, with like effect as if the Exchange were directly referred to. Affiant further states on information and belief that said article was published and designed and intended by the said Fort to refer to the Exchange and to be accepted by the readers of the newspaper as so referring to the Exchange, and that they were so generally understood by the readers, growers of cabbage and the public generally. Affiant further states that said publications were intended by the said Fort to imply that the decline in the price of cabbage is occasioned and induced by the Exchange. Affiant further states on information and belief that said article and advertisement were designed and calculated by the said Fort to interfere with, hamper and injure the business of the Exchange, and ultimately to destroy it, and affiant states that the object of said publication was to interfere with, hamper and damage the Exchange in its business.''

Other acts, also, are charged in the affidavit, but they were not relied upon in the lower court as entitling the

plaintiff to a judgment, nor are they relied upon here to sustain the judgment.

One of the articles appears in the first column on page one of the Brighton Blade; the other appears among the advertisements at the end of page four of that paper. They follow in their order.

[Page 1]

"Who Cut Cabbage?

"The Farmer is Again the Goat in

"Price Cutting War.

"On July 25th, the W. E. Northway Marketing Company, of Brighton, sent out a circular in which they quote the price of cabbage at $2.50 a hundred weight for full cars, and $2.75 a hundred weight for mixed cars.

"According to information reaching the Blade, that has been carefully checked, all others of the large shippers were selling for $3 a hundred on that day, and continued to offer $3 until Monday night, July 27th. At that time telegrams and notices began to come back from the southern market, saying that Northway was quoting cabbage at a lower price.

"With practically no cabbage being put on the market from other producing points, hundreds of dollars are being lost by the growers on account of this price cut. If ever the cabbage growers deserved a decent price for their hard work it is this season.

"On July 29th Mr. Northway again cut the price, this time to $2, while Z. J. Fort and the other shippers were offering $2.25.

"On August 1st Mr. Fort was paying $1.75, and Northway cut to $1.50.

"On August 4th other shippers were offering $1.50, and Northway went down to $1.25.

"On Friday, August 7th, Fort was offering $1.25 and Northway dropped to $1.

"What the price of cabbage will be at the end of this week is hard to tell—probably about 50 cents, if Northway keeps up his price cutting.

"Mr. Northway has been to The Blade several times to have us 'expose' the price cutters to the public view, which The Blade has done, consistent with our policy of getting as fair prices as possible for the farmers. We do the same in this instance to stop the price cutting and save the needless drop in price to the growers if possible.

"According to general cabbage crop conditions and the government market reports, about $2 to the grower would be the right price now.

"In all other states on Friday, August 7th, sixteen cars of cabbage were shipped, which is very low for this time of the year. Colorado shipped nineteen cars on that day.

"Copies of the circular and telegrams are in the hands of The Blade to prove these statements.

"On Friday, July 24th, Mr. Northway, it is reported, stopped putting the price paid to the growers on the weight tickets.

"One letter from the Florida Citrus Exchange, the citrus growers' co-operative exchange, is published as follows:

" 'Mobile, Ala., August 4, 1925.

" 'The Celeryvale Farm, Brighton, Colorado.

" 'Gentlemen: Northway offering cabbage at $30 yesterday. Looks like they lead in the decline every time. If I remember, they did the same last year.

" 'Our buyers are apt to buy from the firm that declines their price first, especially this season, when they are all grumbling about the high price of cabbage.

" 'The broker for Northway would not be able to get the business here at equal prices, but it is possible he will land a few orders when his prices are so much cheaper than others.

" 'Cabbage and vegetables are moving very slowly with us this year. It will probably improve when weather gets a little cooler.

" 'Don't know what Northway is quoting today, but it looks like immediately others reduce price to their quotations, they drop some more.

" 'Yours very truly, Richard Gibson.' "
[Page 4]
"$50,000 Lost by Colorado
"Cabbage Growers
"in the past 15 days, all on account of the rule or ruin policy adopted by some shippers. The grower should be getting $2.00 today for his cabbage, as the crop is short all over the United States.

"If you wish to know who is responsible for this price cutting, call at our office. We have the information.
"The Celeryvale Farm
"Brighton                                    Colorado."

An attachment was issued; the defendant's motion to quash the petition was denied; and thereupon the defendant filed his answer. In the answer the defendant admits that Northway is manager of the Exchange; that the two articles appeared in the Blade; that the advertisement headed "$50,000 Lost" was inserted by the defendant; and that the Blade has a circulation in Adams county. He denies the other allegations in the petition and the affidavit. Among other things, he alleges that the plaintiff is marketing cabbage in competition with the defendant; that the defendant, for thirty years last past, has been engaged in the business of growing, buying and selling vegetables to the wholesale trade in the various states; that he is interested in maintaining at Brighton the best price obtainable for cabbage; that the plaintiff and the Northway Marketing Company, for the purpose of obtaining business for the Northway Marketing Company, or obtaining membership in said Exchange, have represented to growers of cabbage and vegetables that the defendant and others similarly situated were responsible for the lowering of prices paid therefor, while at the same time the Northway Marketing

Company itself (as the defendant has been notified by customers), has been quoting under the market price; that upon becoming apprised of the situation, the defendant exhibited to the editor of the Blade the information so received by him; that thereupon the editor published the article headed "Who Cut Cabbage?" and the defendant inserted the article headed "$50,000 Lost," so that the cabbage growers not members of the Exchange may be advised of the conditions of which the defendant had become aware; and that this was done by the defendant to prevent the destruction of his business by misrepresentation as to his being the cause of loss to the growers of cabbage.

The defendant requested a jury trial. The request was denied. The court, after hearing the evidence, found the defendant guilty of contempt, and a decree in accordance with the finding was thereupon entered.

1. The defendant assigns as error the denial of his application for a trial by jury. This assignment cannot be sustained. *Fort, et al., v. Co-operative Farmers' Exchange,* 81 Colo. 431, 256 Pac. 319.

2. Upon review of a contempt judgment, we cannot correct mere errors or mere irregularities. In this case we are confined to the inquiry, whether the trial court had jurisdiction and regularly pursued its authority. *Fort, et al., v. Co-operative Farmers' Exchange, supra.* Did the court acquire jurisdiction? If the petition and the affidavit state facts that, if true, show that a contempt was committed, the court had jurisdiction to proceed; otherwise, the court did not acquire jurisdiction. *Cooper v. People,* 13 Colo. 337, 22 Pac. 790, 6 L. R. A. 430; *Mullin v. People,* 15 Colo. 437, 24 Pac. 880, 9 L. R. A. 566, 22 Am. St. Rep. 414; *Wyatt v. People,* 17 Colo. 252, 28 Pac. 961; *Coulter v. People,* 53 Colo. 40, 123 Pac. 647; *Griffith v. People,* 74 Colo. 197, 219 Pac. 1072. What is the order that it is claimed the defendant violated? The only part of the order that it is claimed was violated is

that the defendant refrain from interfering "with any of the business of the Exchange." As we have already stated, the affidavit made other charges, but such charges have been abandoned. In determining whether the facts stated in the petition and the affidavit show that a contempt was committed, we eliminate from consideration the abandoned charges. What is meant, in the injunction order, by the words "interfering * * * with any of the business of the Exchange?" To understand them, we must consider the words that accompany them. The order reads:

"[That] you * * * do absolutely refrain from and desist from inducing the breach of or interfering in any manner with the marketing contracts of the Co-operative Farmers' Exchange, Inc., and with its members, and with any of the business of the Exchange, particularly that you and each of you do refrain and desist from buying or attempting to buy, directly or indirectly, or at all, any cabbage from any persons having marketing contracts with the Plaintiff Exchange, and that you and each of you do refrain and desist from receiving or attempting to receive, directly or indirectly, or at all, cabbage from any person having marketing contracts with the Exchange for cabbage grown or contracted by them or any of them.

"Provided, however, that these restraints shall not prohibit the defendants from purchasing cabbage from those who shall have voluntarily breached their contracts with Plaintiff Exchange, and voluntarily without any arrangement, solicitation or inducement directly or indirectly by the defendants, or any of them, shall have brought to the place of business of any of the defendants, cabbage for sale or disposal, but this proviso shall not permit the defendants to receive or attempt to receive, directly or indirectly, cabbage from any of the growers heretofore restrained by the injunctive order of this court, in cause No. 6686, entitled The Co-operative Farmers' Exchange, Inc., plaintiff, vs. J. Honda, et al., or

growers hereafter restrained by this or any other Court from breach of their marketing contracts with said Exchange.''

Obviously, the purpose of the suit and of the order was to prevent the defendant from interfering with the marketing contracts made by the Exchange, whether such interference be by buying from persons known to be parties to such contracts, or by inducing such persons to breach their contracts with the Exchange. The order bears evidence of having been hastily drawn. For example, does the first part of the order mean that the defendant is restrained from interfering generally with the members of the Exchange? If so, in what manner? In any conceivable manner? Or does it mean that the defendant is restrained from interfering with the contracts of the Exchange with its members only? It does not say so. However, it should be so construed as to prohibit interference with contracts only, and not so as to prohibit, generally and indefinitely, interference with the members of the Exchange. So, when we consider the words ''and with any of the business of the Exchange,'' immediately following the words just discussed, we cannot believe that the court, in using these words, intended to depart from the purpose of the suit and of the order, and attempt to restrain, generally and indefinitely, any and all kinds of interference with the business of the Exchange, regardless of the nature, kind and manner of such interference, and regardless, also, of whether the interference be lawful or unlawful.

Knowingly to induce or to attempt to induce a member of a co-operative marketing association to break his marketing contract with the association, is a misdemeanor. S. L. 1923, Chap. 142, sec. 28. Being an unlawful interference, such act, under certain circumstances, may be restrained by order of court. For the violation of such an injunction, this defendant was adjudged guilty of contempt in another suit, and we have just affirmed the judgment, *Fort, et al., v. Co-operative Farmers' Ex-*

*change,* 81 Colo. 431, 256 Pac. 319. The present case presents a different question. Interference with business occurs in many ways. A woman tells her friends that in her opinion X sells better goods and sells them at lower prices than does Y, and advises them to transfer their patronage from the latter to the former. They follow her advice. B operates a stage line between two towns, having invested thousands of dollars in coaches, horses and other equipment. A railroad is built, and B is driven out of business. C employs hundreds of men in his factory. A manufacturer of machinery induces C to install machinery, and this results in the discharge of many men. In these instances, and in thousands of similar instances, business and occupation are interfered with—sometimes disastrously to those affected—but such interference is lawful and cannot be enjoined. The hardship results from the economic law of competition, which has been called the life of trade. Such misfortunes occur in every business, trade and profession—indeed, in every calling. See *Master Builders' Association v. Domascio,* 16 Colo. App. 25; *Passaic Print Works v. Ely & Walker Dry Goods Co.,* 44 C. C. A. 426; *Sorrell v. Smith,* App. Cas. for 1925, p. 700. The defendant and the Exchange are competitors in business in the same field. As long as the defendant continues in business, he will interfere with the business of the Exchange; and as long as the Exchange—a newcomer—continues to function, it will interfere with the defendant's long-established business. In 15 R. C. L. p. 73, the law is stated thus: ''So competition in business, though carried to the extent of ruining a rival, is not ordinarily actionable, but every trader is left to conduct his business in his own way, so long as the methods he employs do not involve wrongful conduct such as fraud, misrepresentation, intimidation, coercion, obstruction, or molestation of the rival or his servants or workmen, or the procurement of the violation of contractual relations. If disturbance or loss comes as the result of competition, or the exercise of like rights by others, as

where a merchant undersells or oversells his neighbor, it is damnum absque injuria.''

The instances of unlawful interference with business are infinitesimal when compared with the instances of lawful interference.

By our Constitution, every person is guaranteed the liberty ''to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty.'' Art. II, sec. 10. There are occasions, however, when a publication will be restrained. Thus, under certain circumstances, a publication will be enjoined where it would unlawfully interfere with property rights. In harmonizing this section with other provisions of the Constitution, courts have necessarily limited the operation of this section. Some there are that believe that in this process of harmonizing, this important provision has been unduly limited in its scope. Be that as it may; further limitation should not be imposed except in cases of clear necessity. In doubtful cases, an injunction order should not be so construed as to forbid the discussion of matters of public interest; of matters, for example, that vitally affect an industry upon which depends the prosperity of a community, large or small. It is not necessary for us to determine whether or not the words in question are too general to be capable of enforcement, or whether or not the defendant should have applied to the court to make them more definite, or whether or not an action for libel could be maintained. Construing the words in connection with the other words in the order, and keeping in mind the considerations to which we have called attention, we conclude that the order did not forbid, either in terms or by fair implication, the publication of the articles of which complaint is made. It follows that the matters charged in the petition and the affidavit do not show that a contempt was committed by the defendant. The lower court, therefore, acquired no jurisdiction to proceed. The defendant's motion to quash the petition should have been sustained.

The judgment is reversed, with the direction to dismiss the petition.

MR. CHIEF JUSTICE BURKE, MR. JUSTICE ADAMS and MR. JUSTICE CAMPBELL concur.