Nelson BOCK and Patricia Lawless–
Avelar, Petitioners,

v.

WESTMINSTER MALL COMPANY,
Respondent.

No. 90SC433.

Supreme Court of Colorado,
En Banc.

Oct. 7, 1991.

Rehearing Denied Nov. 4, 1991.

Tim Atkeson, Arnold & Porter, David H. Miller, American Civil Liberties Union, Denver, for petitioners.

James L. Aab, Denver, Elizabeth Drill Nay, Robert Steven Caldwell, Lewis, Rice & Fingersh, Kansas City, Mo., for respondent.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review *Bock v. Westminster Mall Co.*, 797 P.2d 797 (Colo. App.1990), in which the court of appeals held that individual members of "The Pledge of Resistance" did not have a protected right to distribute leaflets in the common areas of Westminster Mall

("Mall"), a privately-owned commercial and retail center. The issue here is:

> Whether Article II, Section 10 of the Colorado Constitution prevents the private owner of an enclosed shopping mall from excluding citizens engaged in non-violent political speech from the common areas of the mall? [1]

For the reasons stated below, we reverse the judgment of the court of appeals. Within the public spaces of the Mall, Article II, Section 10 protects petitioners' rights to distribute political pamphlets and to solicit signatures pledging non-violent dissent from the federal government's foreign policy toward Central America.

## I.

Petitioners, Nelson Bock and Patricia Lawless–Avelar, are members of an unincorporated political association known as "The Pledge of Resistance." Petitioners sought permission to distribute their pamphlets and to solicit protest signatures in the common areas inside the Mall. Respondent, Westminster Mall Company ("Company"), owner of the Mall, denied petitioners' request.

Petitioners sought declaratory and injunctive relief on the ground that they had a protected right to disseminate information and to solicit signatures from the public as denied by respondent. Following discovery, the parties filed cross-motions for summary judgment. The district court denied petitioners' motion and granted respondent's motion. After we denied a petition for writ of certiorari under C.A.R. 50, the court of appeals affirmed the district court's judgment. We then granted certiorari pursuant to C.A.R. 49.

The Mall is a regional shopping center. Its primary geographic service zone is not limited to the City of Westminster ("City") but includes numerous Denver suburbs and extends to Boulder, Colorado. The Mall is one of two such centers anchored by five large department stores in the Denver metropolitan area. In addition to the five anchor stores, about 130 other retail and service establishments are tenants of the Mall, including a film theatre. Since an expansion in 1986, the Mall sprawls over approximately 118 acres, including parking for more than 6,500 cars. The central Mall area, counting the anchor stores, totals more than 1,390,000 square feet. Of this total, 134,000 square feet comprise the Mall's common areas. These corridors and concourses not only facilitate the flow of the browsing and/or buying public but also offer fountains, plant foliage, and seating for their convenience.

The Mall's common areas are open to the general public without charge, and no purchase is necessary to enter or exit the Mall. This open access to the Mall is proffered year-round, between the hours of 10:00 a.m. and 9:00 p.m., Monday through Saturday, and between noon and 6:00 p.m. on Sundays. These public hours are extended during more profitable shopping seasons, such as Christmas. In years past, retail sales in the Mall have accounted for more than ten percent of such sales in the City.

Regulating the use of the Mall's common areas is what the Company has called a "no solicitation" policy. With this policy, the Company purports strictly to prohibit controversial or political activities, the distribution of leaflets and handbills, and/or solicitation of any kind. Petitioners sought but were denied permission to distribute political leaflets within the common areas of the Mall. The Company relies on the City's trespass ordinance to enforce its policy.

In practice, however, the policy has not barred a variety of public entities and private groups from taking advantage of the common areas to communicate their messages. On the contrary, the Company has spent several thousand dollars each year to promote these activities. The Jefferson

---

**1.** The court of appeals analyzed the question of petitioners' rights under both the United States and Colorado Constitutions, but we granted certiorari to address the issue only under the Colorado Constitution. The United States Supreme Court has held that the First and Fourteenth Amendments to the United States Constitution do not protect the distribution of leaflets within a privately-owned mall. *Hudgens v. National Labor Relations Board,* 424 U.S. 507, 518, 96 S.Ct. 1029, 1035–36, 47 L.Ed.2d 196 (1976).

County Clerk has sponsored voter registration drives in the Mall's common areas. The Company has allowed a salute to the armed forces, with accepted displays of equipment and literature by various armed forces agencies. Representatives of these agencies were permitted to answer questions from the public and to provide them other information. There has also been a salute to the presidents of the United States, with a display of presidential portraits and information available to all. Art has been exhibited in the common areas, and dance has been staged there as well. Community bazaars have been permitted. The Boy Scouts and the Girl Scouts used the Mall for activities including cookie sales. The Salvation Army was permitted to solicit funds in the Mall.

There are links between the Company and several governmental entities and public monies. The City operates, rent-free, a police substation with a desk and a holding area in the Mall. From this substation, City police officers respond to complaints originating anywhere in the City. The Mall occupies a prominent location in the City across the street from the City Hall. Although the Company employs a private security service, two to four City police officers patrol the Mall during public hours. In addition, certain street and drainage improvements valued at over two million dollars were acquired by the City from the Company. This purchase was financed under the City's bond authority.

## II.

We preface our analysis by re-affirming the high rank which free speech holds in the constellation of freedoms guaranteed by both the United States Constitution and our state constitution. The United States Supreme Court and this court have been extraordinarily diligent in protecting the right to speak and to publish freely. Whether this is because free speech has been conceived as a means to the preservation of a free government or as an end in itself, the results have been the same. Free political speech, such as that involved in this case, occupies a preferred position in this country and this state.

### A.

Concurring in *Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927),[2] Justice Brandeis wrote a most eloquent defense of the freedom of speech and press:

> Those who won our independence ... believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; ... that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American Government.

The role of free speech was re-emphasized in *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), where the United States Supreme Court held that a state could not punish a person for distributing religious pamphlets on the sidewalk of a company town contrary to the company's regulations. In striking the balance with other constitutional rights, the *Marsh* Court was unequivocal:

> When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the latter occupy a preferred position.

*Marsh*, 326 U.S. at 509, 66 S.Ct. at 280. The right to speak and to publish under the First Amendment, prevailing in *Marsh* and

---

**2.** *Whitney*, where the Court affirmed defendant's conviction for violating the state's criminal syndicalism act, was one of four cases in the 1920s in which the court announced but then rejected the clear and present danger test. "Brandeis's reason for concurring rather than dissenting was that Whitney had not properly argued to the California courts that their failure to invoke the danger test was error...." Martin Shapiro, in *The First Amendment*, Leonard W. Levy, *et al.*, eds. MacMillan (1990) p. 135. *Whitney* was overruled in *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

other United States Supreme Court cases,[3] has been similarly preferred by this court.

### B.

In *People v. Vaughan,* 183 Colo. 40, 49, 514 P.2d 1318, 1323 (1973), we declared unconstitutional a statute criminalizing the mutilation, defacement or defilement of the American flag. The state's interests in preserving the symbols of democracy and/or setting the appropriate limits of dissent, while undeniably important, were insufficient to preserve the statute "[b]ecause of the preferred position of freedom of speech in the United States Constitution." *Id.* This is so even though the First Amendment is framed solely in the negative: no law shall be made abridging the freedom of speech or of press.

In contrast, Article II, Section 10 of the Colorado Constitution advances beyond the negative command of its first clause to make an affirmative declaration in the second clause. The complete text of our free speech article is as follows:

> No law shall be passed impairing the freedom of speech; *every person shall be free to speak, write or publish whatever he will on any subject,* being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and fact.

*Colo. Const.* Art. II, Section 10 (emphasis added).[4] In *People v. Ford,* 773 P.2d 1059, 1066 (Colo.1989), we emphasized this dual guarantee: "The object of article II, section 10 is to 'guard the press against the trammels of political power, and secure to the whole people a full and free discussion of public affairs' " (quoting *Cooper v. People,* 13 Colo. 337, 362, 22 P. 790, 798 (1889)). Thus, the second clause of Article II, Section 10 of the Colorado Constitution necessarily enhances the already preferred position of speech under the First Amendment of the United States Constitution.

### III.

Consistent with the United States Constitution, we may find that our state constitution guarantees greater protections of petitioners' rights of speech than is guaranteed by the First Amendment. The United States Supreme Court's First Amendment jurisprudence on the scope of free speech in the face of private power has had a rather tortuous history, with speech in nominally private spaces at first accorded protection, *Food Employees v. Logan Valley Plaza,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), then eclipsed in *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), and finally suffering a rejection in *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029 (1976). Respondent urges us to follow the twists and turns of this federal road to the end and deny petitioners' claims. We decline. We are unpersuaded by the United States Supreme Court's various reasonings in this line of cases, especially when given an invitation by that Court in a subsequent case, *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), treated below, to forge our own path. The federal about-face was, therefore, not the United States Supreme Court's last word on free speech in the several states. The definitive word was left to the state courts to write.

### A.

In *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040–

---

**3.** *See, e.g., Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988), acknowledging that speech which is "classically political" has long been afforded the highest possible protections. *See also Texas v. Johnson,* 491 U.S. 397, 411, 109 S.Ct. 2533, 2543, 105 L.Ed.2d 342 (1989), and *Frisby v. Schultz,* 487 U.S. 474, 479, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988). *See also Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945) ("Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom.... Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests.").

**4.** Here, the parties agree that the second clause is the relevant clause.

41, the United States Supreme Court explicitly acknowledged each State's "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." 447 U.S. at 81, 100 S.Ct. at 2040–41.[5] In our discussion above, we have highlighted the second clause of Article II, Section 10 of our own constitution, which is an affirmative acknowledgement of the liberty of speech, and therefore of greater scope than that guaranteed by the First Amendment. Moreover, the United States Supreme Court also has recognized that "[i]t is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." *Minnesota v. National Tea Co.,* 309 U.S. 551, 557, 60 S.Ct. 676, 679–80, 84 L.Ed. 920 (1940). We discern no obstacles in the United States Supreme Court's First Amendment jurisprudence which would limit our construction of the Colorado Constitution. Indeed, the converse is true.

The *PruneYard* Court affirmed the California Supreme Court's holding that the California Constitution protected the right of individuals to solicit signatures in opposition to a United Nations resolution in the court-yard of a privately-owned shopping center. In *PruneYard,* the Court rejected the argument that *Lloyd,* 407 U.S. 551, 92 S.Ct. 2219,[6] stood for the proposition that a state is prevented "from requiring a private shopping center owner to provide access to persons exercising their constitutional rights of free speech and petition when alternative avenues of communication [were] available." 447 U.S. at 80, 100 S.Ct. at 2040. This means that, by its constitution, a state may afford individuals the right of speech and petition in commercial and retail centers otherwise privately owned. The First Amendment is a floor, guaranteeing a high minimum of free speech, while our own Article II, Section 10 is the "applicable law" under which the freedom of speech in Colorado is further guaranteed. *PruneYard,* 447 U.S. at 81, 100 S.Ct. at 2040–41.

### B.

Colorado's tradition of ensuring a broader liberty of speech is long. For more than a century, this Court has held that Article II, Section 10 provides greater protection of free speech than does the First Amendment. *See People v. Ford,* 773 P.2d 1059

---

**5.** Following *PruneYard,* state courts have divided on the issue. Several states have held that speech activities similar to that involved here were protected by their state constitutions regardless of whether the activity may have been protected by the First Amendment. *Robins v. PruneYard Shopping Center,* 23 Cal.3d 899, 592 P.2d 341, 153 Cal.Rptr. 854 (1979); *State v. Schmid,* 84 N.J. 535, 423 A.2d 615 (1980), *appeal dismissed sub nom. Princeton University v. Schmid,* 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982); *Alderwood Associates v. Washington Environmental Council,* 96 Wash.2d 230, 635 P.2d 108 (1981). *But cf. Cologne v. Westfarms Assocs.,* 192 Conn. 48, 469 A.2d 1201 (1984); *State v. Felmet,* 273 S.E.2d 708 (N.C.1981); *Western Penn. Socialist Workers 1982 Campaign v. Connecticut Gen. Life Ins. Co.,* 512 Pa. 23, 515 A.2d 1331 (1986); *Jacobs v. Major,* 139 Wis.2d 492, 407 N.W.2d 832 (1987). Each of the cases holding that the speech was protected under the state constitution dealt with a state constitutional provision similar in wording to Article II, Section 10. The California Constitution, at issue in *PruneYard,* provided: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." *PruneYard,* 23 Cal.3d at 908–09, 592 P.2d at 346, 153 Cal.Rptr. at 859. The New Jersey Constitution, at issue in *Schmid,* provided: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right." *Schmid,* 84 N.J. at 556–57, 423 A.2d at 626. The Washington Constitution contained similar wording: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." *Alderwood Associates,* 96 Wash.2d at ——, 635 P.2d at 114.

**6.** In *Lloyd,* the Court addressed the question "as to the right of a privately owned shopping center to prohibit the distribution of handbills on its property when the handbilling is unrelated to the shopping center's operations." *Lloyd,* 407 U.S. at 552, 92 S.Ct. at 2221. The respondents in the case had distributed within a large shopping center handbill invitations to a meeting to protest the draft and Vietnam War. *Id.* at 556, 92 S.Ct. at 2222–23. Security guards informed the respondents they were trespassing and would be arrested unless they stopped distributing the handbills. *Id.* The Court vacated an injunction granted to respondents which permitted them to distribute the handbills within the shopping center. *Id.* at 570, 92 S.Ct. at 2229.

(Colo.1989); *Parrish v. Lamm*, 758 P.2d 1356, 1365 (Colo.1988); *People v. Seven Thirty–Five East Colfax, Inc.*, 697 P.2d 348, 356 (Colo.1985); *People v. Berger*, 185 Colo. 85, 521 P.2d 1244 (1974); *In Re Hearings Concerning Canon 35*, 132 Colo. 591, 296 P.2d 465 (1956); *Cooper v. People*, 13 Colo. 337, 22 P. 790 (1889).

Earlier in this opinion, we noted *Cooper*'s recognition of the dual guarantee in Article II, Section 10. That early statement of principle, contained in an opinion issued within a few years after the Colorado Constitution was adopted and while its drafting was a living memory, is persuasive evidence of the intended broad scope of Article II, Section 10. In *Canon 35*, concerning a blanket exclusion of press photographers from the courtroom, references to the First and Fourteenth Amendment were omitted "for the reason that the provision [Art. II, Sec. 10] of our Colorado Constitution is more inclusive in its coverage of the subject and is equally binding upon us." 132 Colo. at 592, 296 P.2d at 466–67. In *Berger*, reviewing a conviction for promotion of obscene materials in violation of a state statute, we held that:

> we must find not only that the obscenity standards of the statute, as construed under the First Amendment, are met, but also that there has been some abuse of freedom of speech, as envisioned under the broader protective standard of Article II, Section 10 of the Colorado Constitution.

185 Colo. at 89, 521 P.2d at 1245–46.

This more stringent scrutiny of free speech issues under Article II, Section 10 has continued in recent cases. In *Seven Thirty–Five East Colfax, Inc.*, and *Ford*, we held that a tolerance standard, being the most protective of free expression, was the *only* standard which satisfied Article II, Section 10. Finally, in *Parrish*, while scrutinizing section 18–13–119, 8B C.R.S. (1986), which prohibited health care providers from advertising a willingness to waive an insured's deductible co-payment, we flatly stated that: "Section 10 provides greater protection for freedom of speech than does the first amendment to the United States Constitution." 758 P.2d at 1365. With this precedential background, we turn to the arguments of the parties.

## IV.

Petitioners argue that Article II, Section 10 of our constitution guarantees free speech not only as against state or governmental action but also as against certain exercises of private power. Respondents on the other hand argue that the second clause of Section 10 is limited by the first clause and both apply only to direct state action which infringes an individual's right to speak or publish. The facts of the case here, however, belie this simplistic division of the universe into public and private spheres. Indeed, one consequence of the larger measure of protection conferred on speech by our state constitution is the judicial recognition of the impact on constitutional liberties by the many hybrid forms of governmental involvement and/or by private interests performing the equivalent of public functions.

Where governmental entities or public monies are shown by the facts to subsidize, approve of, or encourage private interests and such private interests happen also to restrict the liberty to speak and to dissent, this court may find that such private restrictions run afoul of the protective scope of Article II, Section 10. It is possible for interests, otherwise private, to bear such a close relationship with governmental entities or public monies that such interests are affected with a public interest. Moreover, with or without the benefit of that relationship, a private project may develop and operate in a manner such that it performs a virtual public function.

## A.

Our determination of the form or degree of governmental involvement present in a particular case must be based on the "framework of the peculiar facts or circumstances present." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 726, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961). "Only by sifting facts and weighing circumstances can the nonobvious involvement of

the State in private conduct be attributed its true significance." *Id.* at 722, 81 S.Ct. at 860. In *Denver Welfare Rights Org. v. Public Util. Comm'n,* 190 Colo. 329, 335–36, 547 P.2d 239, 243–44 (1976), we recognized that the nexus between a governmental authority and private action "is neither readily apparent nor easily discoverable in various factual settings."

Considering all the facts and circumstances underlying the Mall's operation with the preferred liberty of speech in mind, we conclude that there was governmental involvement in this case, most assuredly triggering the protections of Article II, Section 10.[7] Respondent's denial of petitioners' rights to distribute political pamphlets and to solicit pledge signatures in the common areas of the Mall therefore violated that provision of the Colorado Constitution. Because we hold, on the facts of this case, that governmental involvement exists and that the open and public areas of the Mall effectively function as a public place, we leave for another day the issue as to whether some lesser form or degree of governmental involvement is a prerequisite to successfully pleading the protections of Article II, Section 10.

### B.

■ Our finding that governmental involvement exists here is not based on any single factor. Nevertheless, we find significant the City's two million dollar purchase, financed through the sale of municipal bonds, of improvements which the Company made to adjacent streets and drainage systems. It is now common for governmental entities to compete, by providing financial subsidies or inducements, to attract private business so as to reap the benefits of an increased tax base. Economic necessity, however, cannot provide the cover for government-supported infringements of speech.

Also significant is the fact that the City operates a police substation in the Mall from which the police respond to complaints throughout the City. The Company provides the space rent free to the City and, in effect, the Mall thus provides a municipal service. The presence of the substation in the Mall conveys the impression that the City participates, either symbolically or actually, in what are in effect content-based restrictions of speech by the Company. That two to four City police officers routinely patrol the common areas of the Mall does nothing to dispel that impression. The enforcement of the Mall's "no solicitation" policy through the City's trespass ordinance, possibly by those same officers patrolling the Mall, transforms the impression into experience. Thus, there is an ongoing mutual subsidization between the Company and the City. The necessity of keeping the peace likewise cannot camouflage government-aided suppression of non-violent political speech.[8]

---

**7.** Since *PruneYard,* it is apparent that the United States Supreme Court's varied analyses of "state action" in the context of a First Amendment claim, although instructive, are not dispositive of free speech cases arising under our state constitution. 447 U.S. at 81, 100 S.Ct. at 2040–41. When a state constitution like ours is more protective of free speech than is the federal constitution, a finding of "state action" according to federal doctrine is unnecessary. In any event, Supreme Court "cases deciding when private action might be deemed that of the state have not been a model of consistency." *Edmonson v. Leesville Concrete Co., Inc.,* —— U.S. ——, ——, 111 S.Ct. 2077, 2089, 114 L.Ed.2d 660 (1991) (O'Connor, J., dissenting). Thus for example, Justice Marshall, concurring in *PruneYard,* found state action present in all three of the "shopping center" cases, *i.e., Logan Valley, Lloyd,* and *Hudgens.* 447 U.S. at 90, 100 S.Ct. at 2045 (citing *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) and *New York*

*Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). We note that none of these cases had the governmental involvement which is present here.

**8.** *See Logan Valley,* 391 U.S. at 319–20, 88 S.Ct. at 1608–09 ("[T]he State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put."); *Marsh,* 326 U.S. at 509, 66 S.Ct. at 280 ("[Private ownership of property] is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute. Insofar as the State has attempted to impose criminal punishment ... for undertaking

Finally, there is a highly visible governmental presence in the Mall. The Army, Navy and the Marine Corps maintain recruiting offices in the Mall. The Jefferson County Clerk conducts voter registration drives in the Mall, reminding citizens of their political duties. In sum, the financial participation of the City in the Mall's progress, the arrangements with the City police substation, and the active presence of other governmental agencies in the common areas of the Mall, constitute governmental involvement in the operation of the Mall.

### C.

■ We are also persuaded that the Mall functions as the equivalent of a downtown business district. As we noted, the Mall is a vast market, now extending over 100 acres. The 130 commercial and retail establishments situated in the Mall are accessible via more than 130,000 square feet of open, common areas, walks and concourses. Walking through or sitting in these open areas each year are many thousands of the public who otherwise engage, no doubt, in conversations on all subjects, including the political. Thus, the historical connection between the marketplace of ideas and the market for goods and services is not severed because goods and services today are bought and sold within the confines of a modern mall. To conclude otherwise would be to allow the vagaries of contemporary urban architecture and planning, or the lack thereof, to prevail over our valued tradition of free speech.[9]

The range of activities permitted in the common areas of the Mall also indicates the extent to which the Mall effectively functions as a latter-day public forum. The

Company allows a variety of groups access to the visiting public through the use of the common areas of the Mall. We have noted that, for example, the Salvation Army solicits donations from the public strolling the Mall. The expressive conduct of artists and dancers has been allowed. Religious expression has not been denied. The common areas are used by a market research firm to survey the public's likes and dislikes. Surely the Mall's theatre has exhibited films of politically controversial content, sparking lively debates among the Mall's patrons.[10] The Company's prohibition of petitioners' non-violent political speech, if allowed to stand, would amount therefore to a non-neutral, content-based restriction. Given that other groups effectively express themselves in the Mall's common areas, those open areas can easily accommodate petitioners' exercise of their liberty of speech. Under these circumstances, the common areas function as virtual public spaces.

We emphasize that there has been no showing that petitioners' activities will adversely affect the Mall's business operations. Petitioners' chosen mode of speech, distributing leaflets and collecting signed pledges, is well within the mainstream. The content of their speech is classically political. In addition, the size of the Mall, the number of visitors the Mall receives, plus the already extensive use of the common areas of the Mall by other individuals and groups, demonstrate that petitioners' activities can be conducted without interfering with the Mall's normal operations and therefore will not affect the Company's property rights. *See PruneYard*, 23 Cal.3d at 909–12, 592 P.2d at 347–48, 153 Cal.Rptr. at 860–61 (*aff'd*, 447 U.S. 74, 100

---

to distribute religious literature in a company town, its action cannot stand.").

**9.** Consider *Hudgens v. NLRB*, 424 U.S. at 539–40, 96 S.Ct. at 1045–46 (Marshall, J., dissenting) ("[T]he owner of the modern shopping center complex, by dedicating his property to public use as a business district, to some extent displaces the 'State' from control of historical First Amendment forums, and may acquire a virtual monopoly of places suitable for effective communication. The roadways, parking lots, and walkways of the modern shopping center may

be as essential for effective speech as the streets and sidewalks in the municipal or company-owned town.").

**10.** "[T]he First Amendment and Article II, Section 10 of the Colorado Constitution afford protection to all forms of communications, including moving picture films, which attempt to convey a thought or message to another person." *Houston v. Manerbino*, 185 Colo. 1, 6, 521 P.2d 166, 168 (1974).

S.Ct. 2035) ("[W]e do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment."). Further, the Company is free to impose reasonable time, place and manner restrictions on the conduct of petitioners' activity, similar to those imposed on the other activities which it has permitted in the past.

## V.

For these reasons, we reverse the judgment of the court of appeals affirming the district court's denial of petitioners' request to speak freely and solicit signatures in the Mall. The cause is remanded with directions to enter summary judgment for petitioners.

ERICKSON, J., dissents, and ROVIRA, C.J., and VOLLACK, J., join in the dissent.

Justice ERICKSON respectfully dissenting:

Certiorari was granted to review *Bock v. Westminster Mall Co.*, 797 P.2d 797 (Colo. App.1990), on the following issue: "Whether article II, section 10 of the Colorado Constitution prevents the private owner of an enclosed shopping mall from excluding citizens engaged in non-violent political speech from the common areas of the mall." We are not called upon to decide whether the United States Constitution extends protection to the petitioners in this case. As the majority notes, the first and fourteenth amendments of the United States Constitution do not extend to the distribution of political literature inside a privately owned shopping mall. Maj. op. at 56 n. 1 (citing *Hudgens v. NLRB*, 424 U.S. 507, 518, 96 S.Ct. 1029, 1035–36 (1976)). The freedom of speech clauses of the Colorado Constitution protect individuals against unwarranted intrusion by the state. Because Westminster Mall is not an entity of the state nor clothed with state authority, I respectfully dissent and would affirm the judgment of the court of appeals.

## I

Westminster Mall opened for business in 1977. Respondent Westminster Mall Company (mall) derives its profit from leasing space to mall stores and taking a percentage of gross sales from the stores. The common areas of the mall, including the interior corridors connecting the stores, are privately owned by the mall. Mall security is provided by a private security firm and a few Westminster police officers who patrol the mall during business hours. Since March 1987, the City of Westminster (Westminster) has operated a small police substation to respond to citizen complaints. As part of an expansion project, the mall made various street and drainage improvements that were later paid for by Westminster with funds obtained from municipal bonds.

The mall maintains a policy prohibiting the solicitation of shoppers and the distribution of leaflets and handbills. In addition, the mall has instituted a permit procedure for noncommercial activities whereby it evaluates each application by various factors, including the kind of activity and its purpose, the number of participants, the risk of injury, and the risk of unreasonable interference with mall tenants. Under this procedure, the mall has approved certain community and charitable activities, including an antique car show, a rare breed dog show, a Jefferson County voter registration drive, a Salvation Army Christmas fund drive, a salute to law enforcement and the armed forces, and a Boy Scout pine wood derby.

In July 1985, petitioners Nelson Bock and Patricia Lawless–Avelar, members of The Pledge of Resistance, sought permission to hand out literature and solicit signatures for the following pledge:

If the U.S. invades, bombs, sends combat troops, or otherwise significantly escalates its intervention in Nicaragua or El Salvador, I pledge to join others in nonviolent public protest at U.S. federal facilities and other appropriate places in order to prevent or halt further death and destruction in Central America.

The mall denied petitioners permission to either leaflet or solicit signatures inside the mall. Petitioners filed a complaint in the Jefferson County District Court seeking declaratory and injunctive relief, alleging that they had a protected right to hand out political and public interest leaflets under the Colorado Constitution. After discovery, both parties filed cross-motions for summary judgment. The district court denied the petitioners' motion and granted the mall's motion dismissing the case with prejudice. On appeal, the court of appeals affirmed the summary judgment issued in favor of the mall. In my view, summary judgment was properly entered by the district court. Accordingly, the court of appeals should be affirmed.

## II

The first two clauses of article II, section 10, of the Colorado Constitution state: "No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty...." Petitioners Bock and Lawless–Avelar contend that these two clauses are independent and that the state action requirement found in the phrase, "No law shall be passed," does not carry over to the second clause. Thus, petitioners reason, the second clause applies to private behavior.

We have recently held that the purpose of article II, section 10 is to " 'guard the press *against the trammels of political*

*power,* and secure to the whole people a full and free discussion of public affairs.' " *People v. Ford,* 773 P.2d 1059, 1066 (Colo. 1989) (quoting *Cooper v. People,* 13 Colo. 337, 362, 22 P. 790, 978 (1889)) (emphasis added). The holding in *Ford* was arrived at after we specifically noted that "[o]ur constitution contains two provisions which protect the freedom of expression." *Id.* at 1065. Therefore, whether the first two clauses are read as separate or joint guarantees of freedom of speech, the requirement still exists that the state, or a private entity with a sufficiently close nexus with the state, *see Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453–54, 42 L.Ed.2d 477 (1974), be an actor in the deprivation of these rights before liability will attach. We recognized this fact when we characterized article II, section 10 as a "limitation upon the power of state officials." *In re Hearings Concerning Canon 35 of the Canons of Judicial Ethics,* 132 Colo. 591, 592, 296 P.2d 465, 467 (1956).[1]

Our cases have not explored the degree of involvement required to turn a private actor into a state actor for the purposes of article II, section 10. The United States Supreme Court, on the other hand, has reviewed this issue numerous times in the context of the state action requirement of the first and fourteenth amendments to the United States Constitution.[2] The Supreme Court's analysis of this issue is pertinent, thorough, and, I believe, persuasive.

---

1. Although In re Cannon 35 was technically the report of a referee, we specifically approved and adopted the report in its entirety. *See* 132 Colo. at 605, 296 P.2d at 473.

2. The fourteenth amendment provides, in relevant part:

   No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

   U.S. Const. amend. XIV, § 1. Note that this portion of the fourteenth amendment has three clauses. The first two clauses contain the word "State" but the third, the Equal Protection

Clause, does not. The federal state action doctrine developed, however, with equal protection cases. See, *e.g., Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). Thus, the state action component of the amendment carries over into a clause lacking specific words of state action. Of course, the second clause of the Colorado Constitution freedom of speech clauses begins with "every person shall" rather than the conjunction "nor" which is used in the federal Constitution to relate back to the prior clauses. Essentially, Colorado's second clause is a definition of the term "freedom of speech" as used in the first clause. It is a natural and reasonable construction, therefore, to read the second clause as a modifier of the first.

The Supreme Court has emphatically stated that the federal Constitution's guarantees of free speech only protect against governmental intrusion:

It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state. See *Columbia Broadcasting System, Inc. v. Democratic National Comm.*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 [1973]. Thus, while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself.

*Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033 (1976). *Hudgens* reviewed the relevant cases relating to whether a shopping center fell under the "company town exception" to the state action doctrine. The Court first recognized that there was an exception to the state action requirement in its first amendment jurisprudence in *Marsh v. Alabama*, 326 U.S. 501, 502, 66 S.Ct. 276, 277 (1946), where it defined a company town as a privately owned area having "all the characteristics of any other American town." Over the vigorous dissent of *Marsh*'s author, Justice Black, the Court in *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 318, 88 S.Ct. 1601, 1608 (1968), extended the company town doctrine to a shopping center by stating that a shopping center was the "functional equivalent" of the business district of a company town. Justice Black felt that the majority had misunderstood the essential elements of a company town:

But *Marsh* was never intended to apply to this kind of situation. *Marsh* dealt with the very special situation of a company-owned town, complete with streets, alleys, sewers, stores, residences, and everything else that goes to make a town.... I can find very little resemblance between the shopping center involved in this case and Chickasaw, Alabama. There are no homes, there is no

sewage disposal plant, there is not even a post office on this private property which the Court now considers the equivalent of a "town."

    ....

The question is, Under what circumstances can private property be treated as though it were public? The answer that *Marsh* gives is when that property has taken on *all* the attributes of a town, *i.e.*, "residential building, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated." 326 U.S., at 502, 66 S.Ct. at 277. I can find nothing in *Marsh* which indicates that if one of these features is present, *e.g.*, "a business district, this is sufficient for the Court to confiscate a part of an owner's private property and give its use to people who want to picket on it."

    ....

To hold that store owners are compelled by law to supply picketing areas for pickets to drive store customers away is to create a court-made law wholly disregarding the constitutional basis on which private ownership of property rests in this country.

*Hudgens*, 424 U.S. at 516–17, 96 S.Ct. at 1034–35 (quoting *Logan Valley*, 391 U.S. at 330–33, 88 S.Ct. at 1614–16 (Black, J., dissenting)) (footnotes and citations omitted).

The Supreme Court reached a different conclusion from that in *Logan Valley* in the later case of *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219 (1972). The facts at issue in *Lloyd* are similar to the case before this court. *Lloyd* involved an attempt, in 1968, by five persons to distribute, in a Portland, Oregon, shopping center, handbills protesting the involvement of the United States in Vietnam. Security guards asked the handbillers to leave. They complied and subsequently brought suit. The Supreme Court reversed the Ninth Circuit's affirmance of the trial court's ruling that the Constitution protected the distribution of handbills at a shopping center. After noting that "it must be remembered that the First and Fourteenth Amendments safeguard the rights of free

speech and assembly by limitations on *state* action, not on action by the owner of private property used nondiscriminatorily for private purposes only," *Lloyd,* 407 U.S. at 567, 92 S.Ct. at 2228, the Court observed:

> Respondents contend ... that the property of a large shopping center is "open to the public," serves the same purposes as a "business district" of a municipality, and therefore has been dedicated to certain types of public use. The argument is that such a center has sidewalks, streets, and parking area which are functionally similar to facilities customarily provided by municipalities. It is then asserted that all members of the public, whether invited as customers or not, have the same right of free speech as they would have on the similar public facilities in the streets of a city or town.
>
> The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh v. Alabama, supra,* involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semi-official municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case there is no comparable assumption or exercise of municipal power.

*Hudgens,* 424 U.S. at 519, 96 S.Ct. at 1036 (quoting *Lloyd,* 407 U.S. at 568–69, 92 S.Ct. at 2228–29). The Supreme Court explicitly stated in *Hudgens* that *Lloyd* overruled the rationale in *Logan Valley. Id.* at 518, 96 S.Ct. at 1035–36.

The import of the thorough and exhaustive review of cases in *Hudgens* is that, although there still exists a company-town exception to the federal free speech state action requirement, a shopping center does not come under this exception. Therefore, a shopping center is outside the safeguards framed in the first amendment. This, I believe, is the proper approach to the interpretation of the Colorado Constitution in the case before us. The Westminster Mall, as a private shopping center, is not within the ambit of article II, section 10.

III

The majority has taken a different tack to this case. Although it does not directly address whether there is a state action requirement inherent in the free speech clauses of article II, section 10, the majority analyzes the case as though one existed. Because there are varying instances of city and county involvement in the mall and its development, the majority concludes that there is sufficient state action to invoke the Colorado Constitution. While the majority, after citing the United States Supreme Court decision in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856 (1961), *see* maj. op. at 60, concludes that "the historical connection between the market place of ideas and the market for goods and services is not severed because goods and services today are bought and sold within the confines of a modern mall," *id.* at 62, it does so without fully examining the elements of the federal state action doctrine.

The fundamental issue in the Supreme Court's state action calculus is the degree of state involvement. "As a general matter the protections of the Fourteenth Amendment do not extend to 'private conduct abridging individual rights.' " *National Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 190–91, 109 S.Ct. 454, 461, 102 L.Ed.2d 469 (1988) (quoting *Burton,* 365 U.S. at 722, 81 S.Ct. at 860). The Court framed the issue in the following manner:

> In the typical case raising a state action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action.... Thus in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor.

*Id.* at 192–93, 109 S.Ct. at 462. *See also Edmonson v. Leesville Concrete Co.,* — U.S. ——, ——, 111 S.Ct. 2077, 2082 (1991) ("Although the conduct of private parties lies beyond the Constitution's scope in most instances, governmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints.").

The Court found state action on the part of a private party exercising a peremptory challenge in *Edmonson v. Leesville Concrete Co.* In *Edmonson,* the Court used a two-part test to evaluate state action: "[F]irst[,] whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor." — U.S. at ——, 111 S.Ct. at 2082–83 (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)) (citations omitted). The first prong was satisfied because the peremptory challenges at issue in *Edmonson* were exercised pursuant to a federal statute. The second test—whether a private party could fairly be deemed a state actor—was based on three factors: "[1] the extent to which the actor relies on governmental assistance and benefits; [2] whether the actor is performing a traditional governmental function; and [3] whether the injury caused is aggravated in a unique way by the incidents of governmental authority." *Id.* at ——, 111 S.Ct. at 2083 (citations omitted). Since peremptory challenges cannot exist without the overt and significant participation of the government, the Court held that the second prong was also satisfied. *Id.* at ——, 111 S.Ct. at 2083–84.

The question before this court is not whether "governmental entities or public moneys are shown ... to subsidize, approve of, or encourage private interests." *See* maj. op. at ——. Rather, we must determine whether this subsidization, approval, or encouragement rises to a significant level, transforming the act of a private

entity into that of the state. On the record before us, I believe the state has not sufficiently clothed the mall in a mantle of state authority.

While I agree with the majority that a determination of state action must be made on a case by case basis, *see* maj. op. at 60, the type of governmental involvement triggering such a determination must be narrowly construed. As the Supreme Court has said,

> although the factual setting of each case will be significant, our precedents indicate that a State normally can be held responsible for a private decision only when it has exercised *coercive power* or has provided such *significant encouragement,* either overt or covert, that the choice must in law be deemed to be that of the State.

*Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (emphasis added). The same analysis should be used to impute state action to a private party.

In *Yaretsky,* the court of appeals held that state action was present when medical discharge decisions were made by physicians and nursing homes because New York adjusted the patient's Medicaid benefits accordingly. The Supreme Court rejected this characterization, reasoning:

> That the State responds to such actions by adjusting benefits does not render it *responsible* for those actions. The decisions about which respondents complain are made by physicians and nursing home administrators, all of whom are concededly private parties. There is no suggestion that those decisions were influenced in any degree by the State's obligation to adjust benefits....

*Id.* Simple action by the state in accordance with the alleged constitutional violation is, therefore, insufficient to turn the actions of a private party into state actions. There must be a nexus between the coercion or encouragement taken by the state and the action that is the subject of the complaint.

The factual setting of *Burton v. Wilmington Parking Authority* is instructive in evaluating the degree of state involve-

ment with private parties that may give rise to state action. In *Burton*, a restaurant practicing racial discrimination was located in a parking building owned and operated by a state agency. The parking authority constructed the facility, placed official signs on the building indicating its public character, and flew state and national flags from the mastheads on the roof. 365 U.S. at 718, 720, 81 S.Ct. at 858, 859. In addition, the land and building were publicly owned and the building itself was dedicated to "public uses." *Id.* at 723, 81 S.Ct. at 861. The Court thought it would be "irony amounting to grave injustice that in one part of a single building, erected and maintained with public funds by an agency of the State to serve a public purpose, all persons have equal rights, while in another portion, also serving the public, a Negro is a second-class citizen." *Id.* at 724, 81 S.Ct. at 861.

Such is not the case here. Westminster Mall was built by private funds and has never been held out as a public building. Apparently, the majority believes a private facility becomes public if it is "develop[ed] and operat[ed] in a manner such that it performs a virtual public function." Maj. op. at 60. Such a rule would impose state action based solely upon the use of a facility rather than the actions of the government. As a result, private businesses would become state actors whenever their activities seem "public" to a court of law. This conflicts with the stricter requirement of coercive power or significant encouragement in *Yaretsky*.

Furthermore, the mall fails both prongs of the *Edmonson* test. First, there is no specific statutory authority, other than trespass laws, for the mall's refusal of petitioners' application to distribute leaflets. Second, the mall cannot fairly be described as a state actor. Even though the mall has obtained some governmental assistance in the form of street and drainage improvements and the provision of police officers to patrol the mall, there is nothing in the record to suggest that the mall relies on this assistance. More significantly, the mall neither performs a tradi-tional governmental function nor was petitioners' injury aggravated by the incidents of state authority. Unlike the peremptory challenges at issue in *Edmonson*, the mall can exist without the overt and significant participation of government. Thus, on balance, the mall fails the second part of *Edmonson*.

At the heart of the United States Supreme Court reasoning is the long held fact that " '[i]ndividual invasion of individual rights is not the subject-matter of the [fourteenth] amendment,' ... and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it." *Burton*, 365 U.S. at 722, 81 S.Ct. at 860 (quoting the *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883)). I believe the same reasoning applies to article II, section 10 of our state constitution.

IV

The record presents no facts showing that Westminster exercised its power over the mall when the mall made its decision to reject the petitioners' permit application. There are, on the other hand, a few facts that might raise the issue of whether Westminster significantly encouraged the mall in a manner that could convert the mall into a state actor.

First, after the mall made street and drainage improvements, Westminster paid for these improvements with municipal bonds. This, however, shows a general, rather than a significant, encouragement of economic development in Westminster. It is noteworthy that these civic improvements benefitted the city as well as the mall. I would not hold that mere encouragement of private enterprise through subsidization or tax breaks turns a business into a state actor. Moreover, there is no nexus between the street and drainage projects and the mall's alleged deprivation of speech rights.

Second, Westminster has a police station in the mall and provides police officers to patrol the mall during business hours.

Were these officers responsible for ejecting the petitioners from the mall, this might be deemed significant encouragement of the mall's speech policies. When the petitioners, however, requested a permit to pass out leaflets, it was the mall administration, not the Westminster police, who rejected the application. There is no evidence in the record to support a nexus between the existence of the police station and officers and the complained of abuse of free speech. The majority only notes a possibility that the mall's policies could be enforced by the Westminster officers. *See* maj. op. at 61. A mere possibility of state action, however, is insufficient to turn the mall into a state actor.

Finally, the mall allowed a Jefferson County voter registration drive. By using county action in addition to city action to reach its conclusion of state action on the part of the mall, *see* maj. op. at 62, the majority blurs the line of just what "state" is acting. Under this analysis, one could throw Colorado and federal connections into the same mix. This lack of specificity in applying the state action doctrine would create an unwarranted and undesirable expansion of the law.

Because the record is void of any evidence showing a nexus between Westminster's actions and those listed in the petitioners' complaint, the mall's actions belong to it alone as a private party and are not converted to those of the state. Accordingly, the free speech clauses of the Colorado Constitution do not reach the acts of the mall, and summary judgment in its favor was proper.

ROVIRA, C.J., and VOLLACK, J., join in this dissent.

